UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-

HARRY KAHALE, *et al.*,

            *Defendants*.

----------------------------------------------------------------x

NOT FOR PUBLICATION
ORDER

09-CR-159 (KAM)

KIYO A. MATSUMOTO, United States District Judge:

        Before the court are: (1) defendant Mitchell Reisman's ("Reisman") motion to preclude the government from questioning government witness Akwasi Amankwah ("Amankwah") regarding his investments in Goldfinger Coin and Bullion, Inc. ("Goldfinger") in 2003 and to preclude admission of government exhibit 56 ("GX 56");[1] and (2) defendant Gregory Scarlato's ("Scarlato") renewed motion for a mistrial based upon the admission into evidence of a redacted email, government exhibit 13A ("GX-13A").[2] As set forth more fully below, (1) Reisman's motion to preclude testimony and evidence concerning Amankwah's 2003 investment in Goldfinger is granted; and (2) Scarlato's renewed motion for a mistrial is denied.

**I.    Background**

        The facts and circumstances as alleged in the Indictment have been detailed in a previous opinion by the court, familiarity with which is assumed. (See generally Doc. No. 110, Order dated 12/23/09 ("12/23/09 Order").) As part of the government's case-in-chief, the government seeks to call Amankwah, an alleged victim of the charged conspiracy, to testify

---

[1] See Doc. No. 212, Ltr. dated 2/5/10 ("Reisman 2/5/10 Ltr."); Doc. No. 213, Ltr. dated 2/6/10 ("Scarlato 2/6/10 Ltr."); Doc. No. 215, Ltr. dated 2/7/10 ("Gov. 2/7/10 Ltr.").

[2] See Scarlato 2/6/10 Ltr.; Gov. 2/7/10 Ltr.

regarding his $50,000 investment in a loan to B.I.M. The government has proffered that it expects Amankwah to testify that in 2003, while seeking to purchase a home, Amankwah and his wife, Jennifer, were introduced to an unindicted co-conspirator, Ken Ifill ("Ifill"), who represented himself has head of a charity known as Caring Little Hands ("CLH"). (See Gov. 2/7/10 Ltr. at 1.)

The government proffers that Ifill advised the Amankwahs about certain investment opportunities that they could pursue in order to make enough money so that they could purchase a suitable home. (See id. at 1-2.) One investment opportunity Ifill allegedly suggested to the Amankwahs involved B.I.M. Mining, and Ifill introduced the Amankwahs to Reisman. (See id.) After allegedly consulting with both Ifill and Reisman, the Amankwahs decided to invest or loan $50,000 in or to B.I.M. which they accomplished by securing a loan in the name of CLH from HSBC bank ("HSBC") in June 2004. (See id. at 2.) When the Amankwahs' B.I.M. investment was not repaid within 45 days as allegedly promised, Amankwah was forced to repay the loan plus $17,300 interest on the CLH loan from HSBC, totaling $67,300. (Id.) Later, after threatening to report Reisman to the FBI, Reisman allegedly arranged for Amankwah to be repaid a total of $67,300, covering the initial $50,000 investment or loan plus the $17,300 paid in interest on the loan. (Id.) The Amankwahs' $50,000 investment in or loan to B.I.M. and the $67,300 repayment allegedly constitute overt acts in connection with the conspiracy charged in Count One of the Superseding Indictment ("Indictment"). (See generally id., see also Doc. No. 55, Superseding Indictment ("Ind't").)

The government further seeks to introduce evidence related to a separate, earlier investment opportunity allegedly suggested to the Amankwahs by Ifill. Specifically, the government seeks to introduce evidence that Ifill recommended that the Amankwahs invest

2

money in Goldfinger through another individual named Bob Cleary. (See Gov. 2/7/10 Ltr. at 1-2, see also GX-3500-JA-1 at 3.) The government contends that the Amankwahs invested $50,000 in Goldfinger in 2003 ("Goldfinger Investment"), prior to their investment in B.I.M., and that the Amankwahs received no return on their Goldfinger investment. (See Gov. 2/7/10 Ltr. at 2.)

The government does not assert that the Goldfinger Investment either involved any of the defendants charged in the Indictment or constitutes a direct act in furtherance of any of the crimes charged in the Indictment. (See Gov. 2/7/10 Ltr. at 1; see also Ind't.) Nonetheless, the government asserts that Amankwah should be allowed to testify fully about his prior investment in Goldfinger in order to explain to the jury how he was defrauded by the defendants in this case, and that the two investments are significantly "intertwined."

## II. Reisman's Motion to Preclude Testimony and Evidence Regarding Goldfinger Investment

Reisman moves to preclude Amankwah's testimony and introduction of evidence, specifically GX-56, regarding the Goldfinger Investment, ("Goldfinger Evidence"). Reisman argues that the Goldfinger Evidence should be excluded on grounds that it is irrelevant because it concerns an investment that does not involve any of the defendants named in this Indictment, and moreover, because there is "no connection" between the Amankwah's Goldfinger Investment in 2003 and the Amankwah's B.I.M. investment in 2004. (See Reisman 2/5/10 Ltr. at 2.) Further, Reisman asserts that the Goldfinger evidence is prejudicial because the government's sole purpose for introducing the evidence is to make Amankwah more sympathetic to the jury. (See id.)

The government opposes on the grounds that the introduction of the Goldfinger Evidence is "important background information regarding why and how [Amankwah] came to invest in B.I.M." (Gov. 2/7/10 Ltr. at 1.) Further, the government contends that the Goldfinger evidence is important to rehabilitate Amankwah from the credibility attacks Reisman will likely launch, as suggested by his opening statement, and to rebut the notion that a "fraudster" cannot also be a victim of fraud. (See id. at 1-4 (noting that the defendants' contentions that they themselves are victims "implicitly recognize[s] merit in an argument that a victim may not also be a fraudster.").) Additionally, the government seeks to introduce the Goldfinger Evidence because it will explain "the fact that Amankwah invested $100,000 and recouped only $67,300" which "places him in a very different light than a person who invested $50,000 and recovered $67,300." (Id. at 3.)

Separately, Scarlato opposes Reisman's motion to preclude and asserts that Scarlato should be permitted to cross examine the Amankwahs about the Goldfinger Investment in order to show (i) "that there was a separate conspiracy of which [Scarlato] was not a part" and (ii) that Reisman "appeared to be a man trusted by investors." (See Scarlato 2/6/10 Ltr. at 1.)

The court finds that because the Goldfinger Evidence is irrelevant to the crimes charged in the indictment and potentially misleading to the jury, the evidence will be excluded. Contrary to the government's assertions, the court finds that the Amankwah's Goldfinger Investment was far from "intertwined" with their investment in B.I.M. (See Gov. 2/7/10 Ltr. at 3.) Rather, the Goldfinger Investment appears to have been a separate transaction involving neither B.I.M. nor any of the defendants charged here. Thus, the Amankwah's Goldfinger Investment is simply not relevant to any of the issues in this case: namely whether the defendants defrauded investors and lenders through B.I.M., as charged in the Indictment.

Further, evidence regarding the Goldfinger Investment is unnecessary to provide background or context in connection with the Amankwah's B.I.M. investment or to rebut the argument that a "fraudster" cannot also be a victim of fraud. Rather than providing helpful background, if introduced, the Goldfinger Evidence creates the significant risk of confusing the issues and misleading the jury even if proper limiting instructions are employed. The Amankwahs' investments in gold bullion in connection with Goldfinger, and the gold delivery certificates in connection with B.I.M., could easily be conflated in the minds of the jury and the jury could wrongly perceive that the defendants here are also being charged in connection with the Goldfinger Investment.[3] Additionally, to the extent Amankwah's credibility is attacked by defendants, the court fails to see how evidence regarding Amankwah's prior, unrelated investment in which he also did not receive an investment return would bolster his credibility, and it rejects on the merits the argument that a purported "fraudster" cannot be the victim of a fraud him or herself. Moreover, without introducing the Goldfinger Evidence the government should be able to elicit testimony regarding the Amankwah's investment in/loan to B.I.M., and present evidence regarding the Amankwah's recovery of $67,300 based upon their investment of $50,000 and repayment of $17,300 in interest paid to HSBC.

Finally, the court has carefully considered Scarlato's contention that preclusion of the Goldfinger Evidence will unfairly constrain his opportunity to develop a defense by presenting evidence that "tends to show that there was a separate conspiracy of which he was not a part" and "important background testimony" supportive of the argument that Reisman "appeared to be a man to be trusted by investors." (See Scarlato 2/6/10 Ltr. at 1.) First, the

---

3 The government itself highlights this danger and illustrates the very manner in which the jury could conflate the two separate investments by writing that the Amankwahs "invested $100,000," without delineating that only $50,000 of that investment went into B.I.M. (See Gov. 2/7/10 Ltr. at 3.)

5

government has not suggested that the Goldfinger Investment is related in any way to the charged conspiracy other than as background and context to the Amankwahs' subsequent investment in B.I.M. Thus, even assuming, *arguendo*, that evidence exists of another conspiracy involving one of Scarlato's co-defendants and other, unindicted, individuals, but not Scarlato,[4] Scarlato has offered no basis for why the existence of such a conspiracy would negate his own (or any other defendant's) intent to participate in the charged conspiracy involving B.I.M., and thus why evidence of another conspiracy would be relevant to his defense. Second, and similarly, regardless of whether Reisman "appeared to be a man trusted by investors," Scarlato fails to make any connection as to why this fact, if proved, could be at all probative of Scarlato's own alleged intention to participate in a scheme to defraud B.I.M. investors and lenders.

Additionally, to the extent Scarlato *again* revisits the issue of severance and suggests that Reisman seeks "to defend himself by preventing Mr. Scarlato from presenting his own defense," (see Scarlato 2/6/10 Ltr.), the court notes that there is nothing in the record before it to suggest that its analysis would conclude any differently had Reisman's trial been severed. The issue is not one of prejudice to Reisman alone, but rather one of probative value, which the Goldfinger Evidence utterly lacks, and which therefore clearly does not outweigh the danger to all defendants, including Scarlato, of confusing the issues and misleading the jury into believing that the Indictment also charges crimes in connection with the Goldfinger Investment.

Accordingly, Reisman's motion to preclude the Goldfinger Evidence is GRANTED.

---

4 The court notes that based on the evidence available to the court at this juncture, Scarlato's suggestion that such a conspiracy does exist appears to be pure speculation.

**III.     Scarlato's Renewed Motion for a Mistrial**

Scarlato first moved for a mistrial on the first day of trial based upon the introduction into evidence, "without notice to counsel,"[5] of GX-13A, an email from Scarlato containing a redaction which "eliminate[ed] the reference to Mr. Reisman's improprieties." (See 2/4/10 Tr. at 129:3-5.) Scarlato renews this motion now. (See Scarlato 2/6/10 Ltr. at 2.) Scarlato's renewed motion is based on his claim that he "has been prevented from cross-examining" certain witnesses "regarding the substance of prior exclusive dealings with Mr. Reisman" and "the nature of the investors' experience in non-traditional investments as it relates to the materiality analysis of the investor/victims," resulting in the jury's "contrafactual understanding about why Mr. Wetmore would have invested $200,000 with B.I.M. even after the first [Philippines Island Recovery Project] was 'aborted.'" (Scarlato 2/6/10 Ltr. at 2.)

---

5 The court notes that the record contradicts Scarlato's assertion that the redacted email was introduced "without notice to counsel." (See Scarlato 2/6/10 Ltr. at 2.) First, as the government notes, the government provided notice to all counsel of the redacted document by letter filed via ECF on January 31, 2010. (See Doc. No. 185, Ltr. dated 1/31/10 (noting "for your convenience" certain changes from the government's prior exhibit list, including that "a line from GX 13A has been redacted").) Second, at the time the government sought to introduce the exhibit at trial, counsel for Reisman objected, and during the sidebar that followed in the presence of all counsel, the following exchange took place:

> MS. MURRAY: Your Honor, I withdraw my objection because the issue I was objecting to, it turns out it's been redacted.
>
> MS. HILL: This part (indicating).
>
> THE COURT: Okay.
>
> MS. HILL: There's a line, it makes reference to Mitchell Reisman here and we redacted that out.
>
> MS. MURRAY: Okay. Thank you.
>
> *     *     *     *
>
> THE COURT: Are there going to be any objections to the admission of these exhibits?
>
> MS. MURRAY: No.

(2/4/10 Tr. at 79:23 – 80:11.) This exchange thus made a record for all counsel of the proposed redactions in the government's exhibit and no counsel objected to those redactions. (See id.)

First, as discussed above, Scarlato again fails to make, and the court simply is unable to find on its own, any connection to or explanation for why any witness's unrelated "prior exclusive dealings" with Reisman would negate Scarlato's intent to engage in a scheme or artifice to defraud in this case, as alleged in the Indictment. Moreover, the court fails to understand what probative value the "nature of the investors' experience" in other non-traditional investments" unrelated to B.I.M. could possibly have in this case, which charges the defendants with a scheme to defraud investors and lenders through B.I.M. Finally, the court is unable to piece together Scarlato's arguments as to what "contrafactual understanding" the jury possesses with respect to Wetmore's decision to invest $200,000 in B.I.M. in November 2004.

Scarlato's renewed motion fails to offer any reason for the court to reconsider its previous ruling denying Scarlato's motion for a mistrial, which was made after a lengthy sidebar discussing the issue. (See 2/4/10 Tr. at 129-41.) Accordingly, Scarlato's renewed motion for such relief is DENIED.

**Conclusion**

For the foregoing reasons, Reisman's motion to preclude testimony and evidence concerning the Amankwahs' investment in Goldfinger is GRANTED, and Scarlato's renewed motion for a mistrial is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
February 7, 2010

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge