UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

                                        NOT FOR PRINT OR
            -against-                   ELECTRONIC PUBLICATION


HARRY K. KAHALE, HAROLD                 <u>MEMORANDUM & ORDER</u>
RICHARD GRAHAM,                         09-CR-159 (KAM)
GREGORY C. SCARLATO, and
MITCHELL REISMAN,

            *Defendants*.
------------------------------x

**KIYO A. MATSUMOTO**, United States District Judge:

         Following a nearly three-week jury trial, defendants

Harry K. Kahale ("Kahale"), Harold Richard Graham ("Graham"),

Gregory C. Scarlato ("Scarlato"), and Mitchell Reisman

("Reisman") (together, "defendants"), were convicted on all

counts in a seven-count Superseding Indictment.  Before the

court are all defendants' motions for judgment of acquittal

under Federal Rule of Criminal Procedure 29 ("Rule 29"),

defendant Reisman's motion for a new trial under Federal Rule of

Criminal Procedure 33 ("Rule 33"), and defendants' remaining

objections to the proposed Preliminary Order of Forfeiture.  For

the reasons set forth below, the motions for judgment of

acquittal, motion for a new trial, and the remaining objections

to the Preliminary Order of Forfeiture are denied.

**BACKGROUND**

**I. The Charges**

In September 2009 a grand jury returned a seven-count Superseding Indictment charging each of the defendants with conspiracy to commit mail and wire fraud and various counts of mail and wire fraud. (See ECF. No. 55, Superseding Indictment ("Indictment" or "Ind't").)[1]

Count One of the Indictment charged all defendants with Conspiracy to Commit Mail and Wire Fraud in violation of 18 U.S.C. § 1349. (Id. ¶¶ 9-15.) Specifically, the Indictment charged that between 2003 and 2008 the defendants and others conspired to fraudulently solicit investors and lenders for B.I.M. Mining Corporation ("B.I.M."), a Nevada-based corporation which defendants allegedly falsely portrayed as possessing assets such as gold, minerals, and precious metal resources in various places around the world. (Id. ¶¶ 1, 11.) The Indictment charged that in order to secure investments and loans the defendants misrepresented B.I.M.'s size and business operations, the defendants' own backgrounds and business contacts, and falsely represented that B.I.M. needed investor funds to process, transport and market B.I.M.'s assets. (Id. ¶¶

---

[1]    The original indictment, filed in March 2009, charged one count of conspiracy to commit mail and wire fraud and four counts of mail fraud. (See ECF. No. 1.)

11-12.)  In exchange for investor money, the Indictment charged
that the defendants issued fraudulent "Gold Delivery
Certificates" which promised investment returns within specified
periods of time, usually between two and twelve months.  (Id. ¶
13.)  The Indictment further charged that upon maturation of the
Gold Delivery Certificates, defendants sent the investors
letters providing various fraudulent justifications for a delay
in redemption.  (Id. ¶ 14.)  The Indictment also charged that
the defendants used the investor and lender money to repay
earlier investors and lenders and for defendants' own personal
expenses.  (Id. ¶ 15.)

         In order to execute the fraudulent scheme, the
Indictment charged at Counts Two through Six that the defendants
engaged in mail fraud, and at Count Seven, wire fraud.  (Id. ¶¶
16-21.)  Specifically, the Indictment charged at Counts Two
through Five that defendants mailed or caused to be mailed four
letters within the Eastern District of New York and elsewhere in
violation of 18 U.S.C. §§ 1341 and 2.  (Id. ¶¶ 16-17.)  The
Indictment charged that the letters were sent to B.I.M.
investors and lenders[2] and listed the approximate dates the

_____

[2]      The Indictment charged that the mail and wire fraud counts involved
individuals identified as Investor Numbers 1, 2, and 3.  (See Ind't ¶ 8, see
also id. ¶¶ 16-21.)  The evidence at trial revealed that Investor No. 1,
referenced in Count Three, is Peter Valentini, Investor No. 2, referenced in
Counts Two, Four, and Five, is Marcello Valenzano, and Investor No. 3,
referenced in Count Six, is Vernon Wetmore.  (2/16/10 Trial Transcript at
1601.)

letters were mailed, the points of origin, and destinations. (Id. ¶¶ 16-17.) Counts Two, Four, and Five related to the mailing of letters from Las Vegas, Nevada to Marcello Valenzano in Flushing, New York on or about November 17, 2007, October 3, 2006, and March 24, 2006, respectively. Count Three related to the July 18, 2007 mailing of a letter from Las Vegas, Nevada to Peter Valentini in Glen Cove, New York.

Count Six of the Indictment charged that "within the Western District of New York and elsewhere" the defendants committed mail fraud by causing a check in the amount of $200,000 to be mailed from investor Vernon Wetmore in Falconer, New York to Scarlato in Slatington, Pennsylvania. (Id. ¶¶ 18-19.)

Count Seven charged that the defendants committed wire fraud in violation of 18 U.S.C. § 1343 by transmitting and causing to be transmitted a $90,000 wire transfer on or about October 27, 2005 from Commerce Bank in New Jersey to HSBC Bank in Brooklyn, New York. (Id. ¶¶ 20-21.)

Finally, the Indictment included a forfeiture allegation pursuant to 18 U.S.C. § 981 and 28 U.S.C. § 2461 which charged that defendants were liable for forfeiture of "any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense(s), including but not limited to, a sum of money up to a value of not less than

4

$1,040,000" due to defendants' commission of one or more of the offenses charged in the Indictment. (Id. ¶¶ 21-23.)

## II.     The Evidence at Trial

At trial, the government called as witnesses several individuals who testified that they had invested funds or loaned money to B.I.M.

### A. Vernon Wetmore

First, the government called Wetmore, an executive vice president for Cisco Foods who testified that he had a net worth of between three and four million in 2004. (See Tr.[3] 47-243.) Wetmore testified that he first learned about B.I.M. through Reisman who informed Wetmore that B.I.M. was an "asset rich cash poor" company that processed gold into bullion. (Id. 47-48.)

Reisman also told Wetmore that B.I.M. needed investor funds to process gold worth $21 million. (Id. 49-50, GX 2.) Wetmore testified that as evidence of B.I.M.'s need for funding, Reisman showed him a "Gold Delivery Certificate" which was

---

[3]     "Tr." refers to the trial transcript (pages 1-2103), recording the trial of February 4-19, 2010. However, the official trial transcript duplicated pagination on the days of February 11, 12, and 15 (pages 1034-1254), and the parties' post-trial submissions cite to the erroneously paginated transcript. Thus, in order to preserve and clarify the record the court has also identified by date any transcript citations involving the duplicative pages (1034-1254) which correspond to trial days February 11, 12, and 15. (Compare 2/11/10 Tr. 1034 and 2/12/10 Tr. 1034.) In addition, the court notes that the transcript of the jury selection on February 1, 2010 is separately paginated at 1-332.

signed by Kahale and Graham and which indicated that B.I.M. had rights to "two metric tons of dore gold" in Mexico. (Tr. 48, 50, 144, 148, GX 2.) Wetmore stated that Reisman also told him that an investment in B.I.M. would yield a "100 percent payback" and that Reisman had put his own father "into" B.I.M. (Tr. 53, GX 3.) Wetmore testified that Reisman further explained that an investment by Wetmore would "help cover . . . the production costs of processing gold" located in Mexico into gold bullion. (Tr. 143-44.)

Wetmore decided to invest $100,000 in B.I.M. and per Reisman's instructions sent a check on June 4, 2004 to "Mitchell Reisman, CPA, LLC." (Tr. 54, 57; GX 1, GX 4.) Wetmore testified that when his initial $100,000 investment was due to mature six months later, on November 21, 2004, he did not realize a return. (Tr. 58.)

Yet prior to the maturation date of the $100,000 investment, Wetmore testified that he made a second B.I.M. investment. (Id. 58-59.) Both Reisman and Scarlato, who were partners in an entity called Alliance Group ("Alliance"), approached Wetmore regarding this second B.I.M. investment. (Id. 59.) While contemplating his second B.I.M. investment, however, Wetmore testified that he did not discuss his first $100,000 investment with any defendant other than Reisman. (Tr. 150, 160-63.) Wetmore stated that Reisman and Scarlato told him

that B.I.M. needed additional investor funds to complete another project called the Philippines Island Recovery Project which sought to repatriate certain gold assets located in the Philippines which had been left there after World War II. (Id.) According to Wetmore, Reisman and Scarlato represented that B.I.M. had these gold assets "on the ground" and it "wasn't going to be long before they [would be] able to move them." (Id. 65.) Reisman and Scarlato further represented to Wetmore that Kahale was a former U.S. Special Forces operative who had significant contacts in the government and military, which Wetmore viewed as potentially helpful for the proposed B.I.M. project. (Id. 62.) In the course of learning about the Philippines Island Recovery Project, Wetmore participated in conference calls with both Reisman and Scarlato, as well as a call with Reisman, Scarlato, Kahale, and Graham, although Wetmore did not recall ever hearing Graham's voice during that call. (Id. 59-61.)

Wetmore ultimately agreed to invest in the Philippines Island Recovery Project as a second B.I.M. investment on the understanding that his money would be used to fund the logistics of transporting gold back to the United States, and on November 11, 2004 he sent a check for $200,000, payable to Alliance to Scarlato. (Id. 63-64, GX 8.) Wetmore stated that he was not told that any commissions would be withheld from his investments

and that he expected all of the funds he invested to be used toward the gold ventures. (Id. 88, 96-97.)

The record established that Wetmore had contact with each of the defendants in connection with the $200,000 investment. In July 2005, Scarlato contacted Wetmore and stated that there were complications with the Philippines Island Recovery Project. (Tr. 68.) During a subsequent conversation involving Wetmore, Kahale, Graham, and Scarlato, Scarlato offered to convert Wetmore's $200,000 investment in the Philippine Island Recovery Project into a B.I.M. investment secured by a Gold Delivery Certificate worth $400,000 and with a maturity date in January 2006. (Id. 68-69, 121-22, 125, 231-32, GX 24.) During this conversation, Wetmore also inquired about the $100,000 investment. (Tr. 161.) Wetmore accepted Scarlato's offer in connection with his $200,000 investment and received a Gold Delivery Certificate made out to him and signed by Kahale and Graham. (Id.)

In January 2006, Wetmore was unable to redeem the Gold Delivery Certificate and instead, beginning in December 2005, he started receiving regular updates from Scarlato, Kahale, and Graham regarding the status of the Certificates. (Tr. 71.) In total, Wetmore received ten investment update letters (GX 11 - 20), many of which were signed by Kahale and/or Graham, and a number of e-mails from, variously, Kahale, Graham, Scarlato, and

Reisman, (GX 13A, 21, 22, 25-27, and 45-46), which provided assorted explanations for the delay in redeeming his investments. (See Tr. 73-88.) The updates continually extended the redemption dates for Wetmore's investments. (See id. at 76-78, 81, 87-88; GX 11, 12, 22, 19, 20.) Ultimately, Wetmore never realized any return on either of his B.I.M. investments. (Tr. 68, 88.)

### B. Akwasi Amankwah

Dr. Akwasi Amankwah ("Amankwah") of New York, an unemployed physician, also testified regarding his involvement in B.I.M. (Tr. 573-74.) Amankwah testified that he was introduced to Reisman, who portrayed himself as a C.P.A. and businessman, in 2004 through his real estate agent Kenneth Ifill ("Ifill"). (Id. 575-76, 595, 599, GX 58.) Reisman and Ifill introduced Amankwah to B.I.M. (Tr. 575, 599, 639-40.) Reisman explained that he was a delegate of B.I.M., which was based in Las Vegas, Nevada, and operated by a man named Kahale, nicknamed "grandmaster," who had worked in the highest levels of government and who also usually lived in the Philippines. (Id. 576-77.) Reisman further explained that B.I.M. needed money and that if Amankwah invested $100,000 in B.I.M. he would be "happy after forty-five days" and would receive a 100% return on his investment. (Id. 575-75, 677.)

Reisman showed Amankwah several documents in connection with the proposed B.I.M. investment. (Id. 577, GX 58, 60, 61, 64.) At this point, Amankwah did not communicate with Scarlato (Tr. 640). Based on Amankwah's conversations with Reisman and Ifill, as set forth in a signed agreement between Reisman and Amankwah (GX 59), Amankwah agreed to loan B.I.M. $100,000 in exchange for a collateral interest of $200,000 in Gold Delivery Certificate #101 from B.I.M. which was signed by Kahale and Graham ("Certificate 101") (GX 60, 64). (Tr. 582-85, 657.) According to Amankwah, he believed that Certificate 101 was secured by gold at B.I.M.'s El Picacho Mine in El Sonora, Mexico, which had an approximately $23 million value and a maturity date of November 21, 2004. (GX 60, 64). Amankwah expected to receive a double return on his $100,000 investment within forty-five days. (Tr. 593.)

Ultimately, however, Amankwah was only able to secure a $50,000 bank loan and therefore he instead loaned B.I.M. only that amount in June 2004. (Tr. 582, 600.) Amankwah's $50,000 investment in B.I.M. was funneled through a charitable organization called Caring Little Hands, and then sent to Reisman. (Id. 594, 599.) Specifically, Amankwah testified that the bank loan was made in his and his wife's names, but deposited into the account of a company called Shelbourne Corporation, which he understood to be the financial department

10

of Caring Little Hands, which then transferred the money to Reisman. (Id. 600-03, 647, GX 57.) Amankwah testified that Reisman was the direct recipient of his investment, and he expected Reisman, in turn, to send the money to B.I.M. so that B.I.M. could invest 100% of the funds in gold recovery from the Philippines. (Id. 594, 603-04, 650-52, GX 62.) Amankwah stated that he did not expect any commission or other expenses to be deducted from the funds. (Tr. 594.)

Forty-five days after the investment, Amankwah was not repaid. (Id. 605.) Amankwah spoke to both Reisman and Kahale after this date and both assured him that he would receive his money but that payment would be delayed. (Tr. 606-07.) After multiple phone calls, Amankwah went to Reisman's office over sixty times to ask about his money. (Id. 609.) At one point, Amankwah threatened Reisman that he would report the case to the police. (Id. 612.) In response, Reisman told Amankwah that Reisman had given $44,000 of Amankwah's money to Scarlato, and that Amankwah should direct his inquiries to Scarlato.[4] (Id. 613.)

---

[4] According to the trial transcript, on cross-examination Amankwah stated that Reisman told him that "5,000 is with Greg Scarlato." (Scarlato Mem. at 4 (citing Tr. 659).) However, Amankwah originally testified that Reisman stated that Reisman sent $44,000 or $45,000 of Amankwah's money to Scarlato, and the bank records support this assertion. (Tr. 613, 2/11/10 Tr. 1189-90, GX 153, 153A.) It therefore appears that the statement that the amount was "5,000" was either a transcription or speaking error.

In early 2005, Amankwah then spoke with Scarlato whom he had previously met at Reisman's office. (Id. 614-15, 654.) According to Amankwah, Scarlato told Amankwah that Scarlato worked for B.I.M. and that Scarlato and Reisman were partners, and further explained that Scarlato "was innocent about [Amankwah's] money" because Scarlato had not accepted Amankwah's money from Amankwah as an investment, but had instead accepted Amankwah's money from Reisman as a gift from Reisman because Scarlato was in dire need of money and Scarlato did not know the money belonged to Amankwah. (Id. 615-16.) However, for a few months in early 2005, Scarlato sent Amankwah money in amounts ranging from $116 to $500, for a total of approximately $1,090.[5] (Id. 664, DX L.) Scarlato also gave Amankwah additional "depth" regarding the "grandmaster" Kahale and B.I.M. and participated in a telephone conference call with Kahale and Amankwah regarding Amankwah's investment. (Tr. 658-59.) Scarlato stopped sending Amankwah money in June 2005, saying that Scarlato did not have money and Amankwah should be focused on Reisman for the return of his money. (Tr. 616, 662.) At this point, in July 2005, Amankwah threatened Reisman that he would report the case to federal authorities. (Id. 617-18.)

---

[5] On direct, and originally on cross, Amankwah testified that Scarlato sent him roughly three payments of around $60, $70, and $90. (Tr. 616, 662.) However, on further cross-examination, Amankwah acknowledged that Scarlato sent him approximately $1,090 in amounts ranging from $116 to $500. (Tr. 654, DX L.)

A few months later, in October 2005, Amankwah was
repaid the full amount of his original investment, or $50,000,
plus the full amount of interest he had paid on his bank loan,
or $17,300, for a total of $67,300. (Tr. 605, 617-20, GX 65.)
Amankwah was repaid by a cashier's check drawn from funds that
were wire transferred by Reisman from Commerce Bank in New
Jersey to HSBC Bank in Brooklyn, New York on October 27, 2005.
(2/11/10 Tr. 1190-91, GX 65, 154, 154A.)

### C. Russell Stern

Russell Stern ("Stern"), a former director at Merrill
Lynch and Smith Barney also testified that in October 2005 he
made a $200,000 investment through Reisman in what he believed
was an oil company. (Tr. 269-271.) According to Stern, as far
as he knew this investment was unrelated to B.I.M. or to the
recovery of gold from the Philippines. (Id. 288-89.)

### D. Purshottam Vacchani

Purshottam Vacchani ("Vacchani") also testified about
his investment in B.I.M. (Tr. 297-426.) Vacchani, a real
estate investor, testified that he first learned about B.I.M. in
November 2005 from a real estate lawyer named John Lumpkin
("Lumpkin"), who showed him various documents related to a
potential B.I.M. investment. (Id. 299-301, 304, GX 90, 91, 91A,
92, 94, 95, 99.) Among the documents Vacchani viewed was a

13

document on B.I.M. letterhead indicating its address on Flamingo Road in Las Vegas and indicating that B.I.M. Mining had assets of $872 million and liabilities of $280 million. (Tr. 301-02, GX 91.) Another document, which was signed by Graham, indicated that Scarlato was a "mandate/agent to B.I.M. Mining." (Tr. 304, GX 90.) Vacchani further understood that Scarlato operated under the name of a company called Metro Group & Thrift ("Metro"). (Tr. 303, GX 100.) Vacchani understood that B.I.M. needed investor funds to process and refinish gold ore it possessed near mines in the Philippines and Mexico. (Tr. 299.) Together, Lumpkin and Vacchani telephoned Kahale and Scarlato who discussed the potential B.I.M. investment with Vacchani. (Tr. 303.) Over the telephone, Kahale explained to Vacchani that Kahale had connections in the Philippines because he was a retired General and both he and Scarlato offered Vacchani personal guarantees if Vacchani invested in B.I.M. (Id. 303, 307.)

Following this telephone conversation and his review of the documents provided by Lumpkin, and based on the personal guarantees of Kahale and Scarlato, Vacchani decided to invest $200,000 in B.I.M. on November 10, 2005. (Tr. 308-09, 380-87, GX 97, 100, 102.) He did so by transferring funds to Scarlato's Metro account. (Id.) In exchange for his investment, Vacchani received a Gold Delivery Certificate promising a return of

$600,000 which was made out in the name of his real estate company and, signed by Kahale and Graham. (Tr. 310, GX 101.) Vacchani testified that his investment was due to mature in six months, or in May 2006. (Tr. 311-12.) Vacchani did not expect to pay any commission on the investment, and expected 100% of his money to be used by B.I.M. to process gold ore and bring it to market. (Id. 322-23.)

However, Vacchani was not able to redeem the certificate when it matured. (Id. 312.) Instead, after the May 2006 maturity date, Vacchani spoke to Scarlato several times on the telephone, Vacchani reported that Scarlato assured him that a deal was "very close" and that Vacchani needed to remain "patient." (Id. 313.) In response to additional inquiries, Vacchani received a letter in June 2007 on B.I.M. letterhead from Kahale which provided various explanations for the delay in redemption and requested that Vacchani remain "patient a little longer and the payback will be very good for you and all the Investors." (Id. 314, GX 103.)

Vacchani also spoke to Graham on the telephone a number of times. Vacchani threatened legal action against B.I.M. but Graham requested Vacchani's patience for another six months. (Id. 317.) In order to agree to wait six more months before pursuing legal action, Vacchani demanded a personal guarantee from Kahale, and in connection with this request

Vacchani met Kahale and Graham in Las Vegas in June of 2007 where Kahale executed a personal guarantee for Vacchani with Graham as a witness. (Id. 317-19, GX 98A.) After the six month period passed, Vacchani repeatedly called B.I.M. and most often spoke to Graham who reportedly gave him various explanations for continuing delays. (Tr. 321.) Vacchani also tried to reach Scarlato around this time but Scarlato never returned his phone calls and the phone and e-mail contacts Vacchani had for Scarlato were eventually disconnected. (Id. 321-22.) Ultimately, Vacchani was never able to redeem the certificate or receive any return on his investment in B.I.M. (Tr. 321.)

### E. Peter Valentini

Scarlato also introduced B.I.M. to Peter Valentini ("Valentini") a retired contractor from Glen Cove, New York. (Tr. 807-09, 870.) According to Valentini, Scarlato told him that Scarlato was a mandate for B.I.M. Mining, a company which Scarlato said owned gold in the Philippines and mines in Mexico and Peru. (Id. 809.) Scarlato further explained to Valentini that B.I.M. was run by Kahale, a Two-Star General who had served in Vietnam under Westmoreland and in the Special Forces as part of the 101st Airborne Division, and who held a black belt in karate. (Id. 810.) According to Valentini, Scarlato claimed that Scarlato had invested his own money in B.I.M., and that the

opportunity to invest in the company was "the chance of a lifetime" because there was "no risk" in the investment. (Id. 810-11.) In connection with Valentini's proposed B.I.M. investment, Scarlato also showed Valentini a color photograph of gold bars the size of coffins located in the Philippines. (Id. 811, 873, 934.) Valentini testified that from Scarlato's office he spoke over the telephone with Kahale, to whom Scarlato referred as "the General." (Tr. 813-14.) Later, Scarlato also showed Valentini a document entitled "Information Release" which bore B.I.M.'s letterhead and described Kahale's military status. (Id. 811-12, GX 75.)

Based on his conversations with Scarlato and Kahale, Valentini testified that he decided to invest $30,000 in B.I.M. and in 2005 Valentini claimed to have wired that amount directly to Scarlato, whom he expected to forward the funds directly to Kahale and B.I.M. (Id. 828-29, 833, 893.) The government introduced a record showing that Valentini gave Scarlato $9,000, but did not introduce any other evidence of Valentini's investments. (Id. 829-30, 880, 911, GX 74.) Based on his conversations, Valentini stated that he expected that his funds would be used to fund the logistics of Kahale and B.I.M.'s efforts to bring gold from the Philippines to this country, and he did not expect that any expenses or commission for Scarlato would be deducted from his investment. (Id. 833-34.) In

exchange for his investment, Valentini received three Gold Delivery Certificates made out to him, and signed by Kahale and Graham. (Id. 830-, GX 70-73.) Under the terms of the Gold Delivery Certificates, the investments were due to mature within six months. (Tr. 832, GX 70-73.)

Valentini also introduced Scarlato to his son, Joseph Valentini ("Joseph"), and his friends Jose Gomez and Marcellus Valenzano ("Valenzano"). (Id. 834.) Valenzano, now deceased, ultimately decided to invest $155,000 in B.I.M. through Scarlato, in exchange for which he also received three Gold Delivery Certificates made out in his name and signed by Kahale and Graham. (Id. 834-838, GX 78-80.) Valenzano also received several investment update letters through the mail from B.I.M. which were signed variously by Kahale and Graham, and which thanked him for his "patience" and provided explanations for the delays in redemption of the Gold Delivery Certificates. (Tr. 839, GX 242, 50-52.)

In the six months following his investment, Valentini testified that he was in constant communication with Scarlato. (Tr. 841.) At one point during their conversations, Valentini reported that Scarlato told him that Kahale needed $25,000 in order to go to the Philippines and bring back the gold. (Id.) Valentini testified that in response he offered to directly purchase plane tickets and hotels for Kahale and others, but

Scarlato responded to him that Kahale preferred the cash, and Valentini then became suspicious that something was wrong. (Id. 841-43.) Subsequently, in July 2007, Valentini received numerous investor update letters from B.I.M., including one signed electronically by Graham, which provided various explanations for the delays in redemption of the Gold Delivery Certificates. (Id. 843-46, GX 53.)

Ultimately, Valentini was unable to recover any profit, any gold, or any of his original investment. (Tr. 832-33, 846.) Valentini then brought a civil suit against B.I.M., Kahale, Graham, and Scarlato in 2007 seeking over $1 million in damages. (Id. 846-47, 882, 888.)

### F. Joseph Valentini

Joseph Valentini ("Joseph"), of Mineola, New York, also testified that he learned about B.I.M. through his father, Peter Valentini, and Scarlato. (Tr. 985.) According to Joseph, Scarlato told him that Scarlato had a "guaranteed deal" on gold, and that Scarlato just needed money for the last step of the project: to get the gold, which was "in hand," from where it was in Mexico to the United States. (Id. 986, 998.) Joseph stated that Scarlato claimed that a General had connections that would help accomplish this goal and that the investment would last three to six months before redemption. (Id. 986-89.) Joseph

also testified that Scarlato said that Scarlato had invested a substantial amount of his own money in B.I.M.  (Id. 986-87.)

Joseph testified that he decided to invest in B.I.M. based upon Scarlato's representations, and in October 2005 he invested $10,000 in B.I.M. by wiring money to Scarlato's company, Metro.  (Tr. 987-990, 995, GX 82, 83.)  In exchange for his and his father's investments, Joseph received two Gold Delivery Certificates made out to him and signed by Kahale and Graham.  (Tr. 991, GX 81, 81A.)  Based on his conversations with Scarlato, Joseph testified that he did not expect that any commission or cut would be taken out of his investment.  (Id. 987.)

Joseph then received copies of Investment Update letters from Scarlato which presented various reasons for delays in redeeming Gold Delivery Certificates and thanked investors for their patience.  (Tr. 992, GX 11, 12.)  Joseph testified that eventually Scarlato stopped returning his phone calls so Joseph began communicating with Scarlato over e-mail and inquiring when he would get paid.  (Tr. 991-94, GX 83.)  In their e-mail correspondence, Scarlato stated that he had sent $7,000 of Joseph's $10,000 investment to B.I.M. and Scarlato argued that "the legal and moral obligation and onis [sic] is on B.I.M. and its appointed officers" with respect to the investment given that a hold harmless agreement had been

executed on behalf of Joseph.  (Tr. 994-1002, GX 83.)  Joseph

stated that Scarlato's e-mail was the first he learned of

Scarlato's 30% commission, and that he would not have invested

had he known of the commission before the investment.  (Tr.

1002-03.)

Ultimately, Joseph was unable to redeem his Gold

Delivery Certificate or recover his original investment in

B.I.M.  (Tr. 992.)

### G. Charles Dolan

Charles Dolan ("Dolan") of New Jersey, a consultant in

the food business, also testified regarding his involvement in

B.I.M.  (Tr. 694-95.)  Dolan testified that in the fall of 2004

Scarlato recommended to him a lucrative gold investment

involving the El Picacho Mine in Mexico.  (Id. 695-96.)

Scarlato explained to Dolan that Scarlato himself was investing

$250,000 of his own money in this gold investment, and that

within six months Scarlato expected to increase that investment

to $1 million.  (Id. 695.)  Specifically, Scarlato told Dolan

that the investment funds would be used for equipment to extract

gold ore from the mine.  (Id. 696.)

Dolan eventually decided to invest $50,000 in the

venture which he accomplished by making out a check to

Scarlato's company, Metro, as requested by Scarlato.  (Id. 697-

98, GX 221, 222.)  Following his investment, Dolan received a
Gold Delivery Certificate from Scarlato which was made out to
Dolan and his wife and signed by Kahale and Graham.  (Tr. 699,
GX 223.)  The Gold Delivery Certificate entitled Dolan to a
return of $250,000 for his $50,000 investment within six months,
or by December 15, 2005.  (Tr. 700, GX 223.)

Dolan testified that he was unable to redeem the
Certificate in December 2005.  (Tr. 701.)  Dolan testified that
he waited a month, but then called Scarlato, who assured him
that there was a delay but that Dolan would get his money.  (Id.
701.)  After additional delays, both Scarlato, and at one point
over the phone, Kahale, guaranteed Dolan that he would indeed
get his money back.  (Id. 701-02.)  According to Dolan, at some
point, Scarlato also informed Dolan that he was travelling to
the Philippines in connection with the gold investment.  (Id.
718-24.)  Dolan was unable to ever recover his investment from
B.I.M.  (Id. 702.)

### H. Misa Wong

Misa Wong ("Wong") testified that she is the owner and
operator of Orchid's Garden, a Chinese restaurant located in Las
Vegas, Nevada, where she met Kahale and Graham and first learned
about B.I.M.  (Tr. 493-97, 537.)  Wong testified that sometime
in 2007 after Kahale and Graham came to Orchid's Garden two or

three times a month for about four months, Kahale mentioned a potential investment in B.I.M. (Tr. 495-97.) Kahale advised Wong that he had access to gold outside the United States, specifically in Thailand, because he had connections among military people in the government and he also knew the government of Thailand. (Id. 497-98.) Kahale further advised Wong that she could obtain "a lot of return" through a gold investment. (Id.) According to Wong, Kahale did most of the talking during these conversations, and Graham did not say anything about the gold investment but Graham would repeatedly nod his head and say "yes, yes" in apparent agreement with what Kahale was saying. (Id. 496-98, 544-45.)

In November 2007, Wong and her husband decided to invest $100,000 in B.I.M. but gave Kahale $80,000 on the understanding that Kahale would grant them a $20,000 discount. (Id. 504, 546, 551, 554, GX 107, 239.) Wong believed that her investment would be used to invest in gold. (Id. 505-06.) In exchange for her investment, Wong received a Gold Delivery Certificate made out to Wong and her husband and signed by Kahale and Graham. (Id. 504-05, GX 108.)

Later, Kahale told Wong that an investment in nickel babbitt, which Wong identified as a "kind of metal material [used] in . . . producing nickel," could produce even greater investment returns than the investment in gold. (Tr. 506.)

Kahale showed Wong what he claimed was a piece of nickel babbitt and the next day Kahale told Wong that he had deposited the metal in a safety deposit box in the Las Vegas Rainbows and Saharas Colonial Bank, and Kahale and Wong each kept a key to that safety deposit box. (Id. 506-09, 567-68, GX 110.) In March 2008, Wong decided to also invest in nickel babbitt through B.I.M. and made another two investments of $100,000 each. (Tr. 513-14, 554, GX 111, 239.)

In total, between her three investments, Wong invested $280,000 in B.I.M. (Tr. 514-15, GX 239.) Wong also testified that she was never told that any commissions or deductions would be taken from her investment. (Tr. 522.) After her investment, Kahale and Graham stopped visiting Wong's restaurant as frequently and eventually stopped coming altogether. (Id. 515.) Finally, in order to make contact with Kahale regarding her previous investments, Wong lied that she was considering another investment in gold. (Id. 521.) Kahale then came to the restaurant again and said he had re-invested Wong's money to buy more gold, and explained that he had been busy on other matters such as working on Michael Jackson's funeral. (Id. 521-22.) Ultimately, Wong was unable to redeem her Gold Delivery Certificate and she did not receive any return on her investments with B.I.M. (Id. 515.)

## I. The Remainder of the Government's Case

The government introduced certified military records showing that rather than being an active duty Two-Star General in the years 2003 through 2008, Kahale had been honorably discharged from the Army in 1965 at the rank of Sergeant. (Tr. 868-69, GX 215.) In addition, the government called Federal Bureau of Investigation ("FBI") Agent Jerald Burkin ("Agent Burkin"), who testified that he served a subpoena upon representatives of B.I.M. requesting that B.I.M. produce certain documents including: (i) contracts and correspondence showing B.I.M.'s entitlement to gold, nickel babbitt, and other resources; (ii) B.I.M.'s corporate tax returns; and (iii) B.I.M.'s expense reports. (2/12/10 Tr. 1124-61, GX 217.) Agent Burkin testified that B.I.M.'s response to the subpoena was minimal and did not include documents that rationally related to these requests. (2/12/10 Tr. 1128-31, GX 226, DX V.)

The government also called two witnesses who testified about financial transactions related to B.I.M. First, the government called attorney Frederick Popovitch who testified that in June 2004 he received $67,000 from Reisman to close a real estate transaction on a house. (2/11/10 Tr. 981-83, GX 216.) Second, the government called FBI financial analyst Brenda Martin ("Martin") who testified regarding her analysis of bank statements and records from financial institutions

pertaining to the bank accounts of B.I.M., Metro and Alliance during the years 2003 through 2008. (2/11/10 Tr. 1162-1228, GX 201-10, 150, 150A-E, 151, 151A-D, 152, 152A-D, 153, 153A, 154, 154A, 155, 155A, 156, 156A, 157, 157A.)

Martin's analysis showed that of Wetmore's $300,000 total investment in B.I.M., only $45,000 went directly to B.I.M. while the remainder went to other expenses for Reisman and Scarlato. (2/11/10 Tr. 1167-1177, GX 150, 150A-E.) For example, when Wetmore sent his original $100,000 B.I.M. investment to Reisman's C.P.A. account, that account had a negative $3,776 balance. (2/11/10 Tr. 1168-69, GX 150A.) Then, over the next twenty days, $96,218.68 was dispersed from Reisman's C.P.A. account, including $67,000 to Popovitch, the real estate attorney, but none of the money was sent to B.I.M. (2/11/10 Tr. 1169, GX 150A.) Of Wetmore's second $200,000 B.I.M. investment, only $45,000 was sent to B.I.M. and the remainder was dispersed elsewhere, including to a personal account of Reisman. (2/11/10 Tr. 1174-77, GX 150, 150A-E.)

Martin's analysis also indicated that Amankwah's $50,000 bank loan which was combined with other funds to form the $100,000 Caring Little Hands investment in June 2004. (2/11/10 Tr. 1189-90, GX 153, 153A.) According to the bank records relied upon by Martin, Reisman's C.P.A. account had a balance of $4.54 at the time of the $100,000 Caring Little Hands

transfer.  (Id.)  The $100,000 was then disbursed in various
increments from Reisman's account, including $44,000 to
Scarlato, but none of the money was transferred to B.I.M.  (Id.)
In addition, according to Martin, when Amankwah was repaid
$67,300 from Reisman's C.P.A. account, those funds were derived
from the $200,000 investment in oil made by Stern.  (2/11/10 Tr.
1190-91, GX 154, 154A.)

Martin also testified that of $219,000 deposited in
Scarlato's Metro account from Joseph Valentini, Vacchani, and
$9,000 in cash, less than half, or $95,000 was sent to B.I.M.
(2/11/10 Tr. 1192, GX 156.)  The remainder of the funds was
directed from Metro's account towards other expenditures,
including $26,131 which went towards Scarlato's purchase of a
2004 Dodge 1500 4X4 motor vehicle.  (2/11/10 Tr. 1192-94, GX
156A, 218, 219.)

Martin also reviewed the $155,000 B.I.M. investment
from Valenzano which was also deposited in Scarlato's Metro
account.  (2/11/10 Tr. 1194, GX 157, 157A.)  About one third of
Valenzano's investment, or $44,000 was sent to B.I.M.  (Id.)

According to Martin's analysis, Dolan's $50,000
investment in B.I.M. was also first deposited in Scarlato's
Metro account and less than half of Dolan's total investment
went to B.I.M. itself, while the remainder of the funds was

27

directed to other expenditures by Scarlato. (2/11/10 Tr. 1191-92, GX 155, 155A.)

Martin also analyzed Wong's $280,000 investment into the B.I.M. account. (2/11/10 Tr. 1177-88, GX 152, 152A-D.) Of Wong's $280,000 total investment, $3,500 was paid to an individual named C.B. Johnson, of Western Sierra Mines, and the remainder went to other expenditures, including cash withdrawals by Graham. (Id.)

Finally, in Martin's review of B.I.M.'s accounts, during the years 2003 through 2008, she found that B.I.M. received a total of $486,901.76 from Scarlato's Metro account, Reisman's C.P.A. account, and directly from the Wongs. (2/11/10 Tr. 1196-97, GX 151, 151A-D.) Of that amount, B.I.M.'s single largest expenditure was withdrawals and checks made out to cash. (Id.) The signatories on the B.I.M. account were Kahale and Graham. (2/11/10 Tr. 1177.)

On cross-examination, Martin acknowledged that her analysis did not take into account any fee or loan agreements between the parties, or funds withdrawn for legitimate expenses such as rent or other office related costs. (2/11/10 Tr. 1204, 1211, DX G.)[6]

---

[6] After much discussion, Defense Exhibit G was ultimately admitted as evidence at trial for all purposes. (2/11/10 Tr. 1249.) Prior to its admission however, the record shows that Scaralto's counsel published Defense Exhibit G to the jury during cross-examination of Martin in connection with a

Finally, the government introduced evidence that when Reisman pleaded guilty to a crime in May 2004, he was warned that he would be required to relinquish his license as a C.P.A., and would be barred from the security investment field at his sentencing. (Tr. 1785-86, GX 234.) In addition, the evidence showed that at Reisman's sentencing in October 2004, such terms were in fact imposed as conditions of Reisman's probation. (Id.)

## J. The Defense Case

Kahale called C.B. Johnson ("Johnson"), who started and operated the Western Sierra Mining company which constructed the El Picacho mine in Sonora, Mexico to try to mine gold. (Tr. 1470-73, HK A1-16.) Johnson identified sixteen photographs of the Western Sierra mine in various stages of completion and explained the process of gold mining. (Tr. 1474-81, HK 1-16.) Johnson testified that Western Sierra Mining had a forward delivery gold contract with B.I.M. in 2003 or 2004, whereby B.I.M. would advance money to Western Sierra, which lacked capital, and then once Western Sierra processed gold B.I.M. would receive the rights to the gold at a discounted price. (Tr. 1481-83, HK B, C.) On cross-examination, however, Johnson testified that B.I.M. never paid on the contract with Western

---

question about whether Martin's analysis considered possible fee agreements between the defendants (2/11/10 Tr. 1210-11, 1245-48).

Sierra and therefore B.I.M. never became entitled to any gold from Western Sierra. (Tr. 1488-92.) Johnson did not recall Kahale ever coming to Mexico to visit the mine, but Johnson testified that he and Kahale met in Las Vegas several times and that he would do business with B.I.M. again. (Tr. 1486-87.)

Graham called Brett Whipple ("Whipple"), an attorney, as a character witness. (Tr. 1426-55.) Whipple testified that he has known Graham for over ten years and has known him to be "just a very, very nice person, to the point of sometimes of being almost gullible" or "over-trusting," and someone who "put friendships and relationships above money." (Id. 1426-35.) In addition, Whipple testified that he has assisted Graham with the preparation of Graham's taxes and reported that Graham had a modest income and resided in the same small space Graham also used as an office located on Flamingo Road in Las Vegas. (2/12/10 Tr. 1124-61, Tr. 1431-32, GX 217.)

Graham also called attorney Marcus Katz ("Katz") who represented Valentini in his civil suit against B.I.M., Kahale, Graham, and Scarlato. (Tr. 1500-34.) Katz testified that he turned over to the government certain documents which he received from B.I.M.'s counsel during the course of the civil suit in response to Valentini's requests for documents showing that B.I.M. was entitled to or possessed gold. (Tr. 1517-21, RG C.)

Scarlato called B.I.M. investor Joseph Sciandra ("Sciandra"), who also learned about B.I.M. through Scarlato. (2/12/10 Tr. 1182.) Sciandra testified that Scarlato showed him a number of documents and photographs prior to Sciandra's investment in B.I.M. (Id. 1185-86, DX W.) Among the photographs were images of Kahale with what appeared to be gold. (2/12/10 Tr. 1189, DX W-1.) Additionally, prior to his investment Sciandra claimed that he spoke on the telephone with Kahale and Kahale's bodyguard, Bob West ("West"), and learned about B.I.M.'s Philippines Islands Recovery Project. (2/12/10 Tr. 1183, 1189-90.) During these conversations, Sciandra testified that West stated that he had been to the Philippines and had been in vaults and put his own hands on stacks of gold. (Id. 11189-90.) West further stated, according to Sciandra, that West had taken the photographs of Kahale with the gold which had previously been shown to Sciandra. (Id.) Sciandra testified that he learned that Kahale had been in the "Black Ops" and that Kahale had government contacts which would enable the project to be completed. (Id. 1190, 1203.)

Eventually, Sciandra invested around $7,000 in B.I.M. by wiring cash through Western Union directly to Kahale in 2005. (Id. 1181-82, 1208-09, 1214.) In exchange for his investment, Sciandra received a Gold Delivery Certificate. (Id. 1193-94.)

The defense also called FBI Agent Peter Brady ("Agent Brady"), who testified that he had run searches on FBI computers which confirmed that West and Kahale travelled to the Philippines during the time period when B.I.M. was recruiting investors for the Philippines Island Recovery Project. (Tr. 1673-74, 1712-13, 1726-29, DX AA, BB, HK D, E.) According to travel records obtained by the FBI, Agent Brady also testified that Kahale travelled to Mexico at various times between 2003 and 2008. (Tr. 1726-30, HK D, E.) In addition, Agent Brady testified that he had determined that certain money transfers were made from B.I.M. to individuals located in the Philippines. (Tr. 1674.) Agent Brady also testified that he received documents upon request from Scarlato, including tax returns which showed that Scarlato claimed certain broker fees as income. (Tr. 1715-21.)

According to an FBI report, Agent Brady also testified that at Brady's request, another FBI agent interviewed an individual named Felix Mijares in the Philippines in November 2009. (Tr. 1730-31, HK G.) According to the FBI report of that interview which was conducted in Tagalog through an interpreter, Agent Brady testified that Mijares told the agent that he worked as a bodyguard and runner, and that in 2005 he met with Kahale and West in the Philippines when Kahale stated that he would send $15,000 to Mijares' bank account. (Id.) According to the

FBI interview report, Mijares told the FBI agent that four months later he did receive $15,000 into his bank account from Kahale which Mijares reported using for personal expenses as well as B.I.M. Mining project-related expenses, including funding visits to four potential mine locations in the Philippines. (Id., Tr. 17643-66, HK G.) However, Mijares also told the FBI Agent in the Philippines that he was unable to purchase any of these mine locations because of insufficient funds. (Tr. 1765-66.) This $15,000 wire transfer from Kahale to Mijares also appeared to be corroborated by bank records obtained by Agent Brady. (Tr. 1753.) Finally, Agent Brady agreed that the FBI report indicated that Mijares had reported to the FBI agent that he had three telephone calls with West between 2005 and 2007. (Tr. 1730-31, HK G.)

Through Agent Brady, Kahale also introduced additional sections of his military record which reflected his honorable service and the views of Kahale's supervisor that Kahale possessed an "untiring devotion to duty." (Tr. 1731-37, HK F.) Additionally, the defendants elicited testimony regarding various investigative techniques which were and were not pursued by the government in investigating this case. (Tr. 1768-77.) Finally, Agent Brady acknowledged that Kahale, Graham, and Scarlato voluntarily spoke with the FBI during the government's investigation. (Tr. 1711, 1741-2.)

Scarlato also submitted evidence pursuant to a stipulation with the government that if called as a witness, Ron Dunson, a chairman of the Capital Region Chamber of Commerce in Connecticut would have testified that persons associated with that group introduced Scarlato to B.I.M. (Tr. 1784-85, DX FF.) In addition, Scarlato submitted Western Union documents showing that in 2005, Scarlato sent Kahale a total of $17,765.98 and Graham a total of $3,618. (Tr. 1785, DX GG.)

## III. Motions for Judgment of Acquittal

At the close of the government's case, Graham argued his motion for a judgment of acquittal while reserving the right for further briefing, and the court reserved ruling. (2/12/10 Tr. 1170-71.) Graham also argued for a judgment of acquittal after the defense case with respect to Counts Two, Four, and Five, which related to mailings received by Valenzano, and the court reserved ruling. (Tr. 1780-84.) In addition, the court granted all defendants' applications, both after the government rested (2/12/10 Tr. 1164-65, 1172, Tr. 1354-55), and again after the defense case (Tr. 1179-80), that their Rule 29 motions be "deemed made" with further briefing deferred until after the jury's verdict.

Post-trial, Scarlato and Reisman submitted letter motions in support of their motions for judgments of acquittal.

(See ECF No. 324, Letter dated 6/3/10 ("Scarlato Mem."), ECF No. 344, Letter dated 7/27/10 ("Scarlato Reply Mem."), ECF No. 321, Letter dated 5/26/10 ("Reisman Mem.").)  In addition, Reisman moved for a new trial pursuant to Rule 33.  (See Reisman Mem., see also ECF No. 357, Letter dated 8/30/10 ("Reisman Reply Mem.").)  Graham and Kahale joined in their co-defendants' motions to the extent applicable.  (ECF No. 323 Kahale Letter dated 6/2/10 ("Kahale Ltr."); ECF No. 325, Graham Letter dated 6/4/10 ("Graham Ltr.").)  The government submitted a memorandum opposing the defense motions.  (ECF No. 343, Memorandum dated 7/20/10 ("Gov. Mem.").)

IV.    **The Forfeiture Hearing**

Upon request of the defendants (see ECF Nos. 296, 297, 298, 300), the court held a forfeiture hearing on June 7, 2010 ("forfeiture hearing") in order to "determine what property is subject to forfeiture." Fed. R. Crim. P. 32.2(b)(1)(A) and (1)(B).  On the record at the conclusion of the hearing, the court denied defendants' previously briefed objections to the proposed Preliminary Order of Forfeiture.  (See Minute Entry dated 6/7/2010.)  However, the court reserved ruling on Scarlato's objection regarding the investors identified in the Indictment, which was first raised at the forfeiture hearing and then joined by the other defendants, (the "remaining forfeiture

objection"), and provided the parties an opportunity to brief this additional issue.  (See id.; see also ECF No. 331, Ltr. dated 6/14/10 ("Scarlato 6/14/10 Ltr."); ECF No. 334, Ltr. dated 6/21/10 ("Gov. 6/21/10 Ltr.").)

## DISCUSSION

### I.    All Defendants' Rule 29 Motions

#### A. Rule 29 Standard

Rule 29(a) provides that a district court shall enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  However, a district court entertaining a motion for a judgment of acquittal must be "careful to avoid usurping the role of the jury."  United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003).  Thus, "Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).  Rather, in assessing a Rule 29 motion, a court must defer to the jury's resolution of witness credibility and its selection between competing inferences that could be drawn from the evidence.  United States v. Tocco, 135 F.3d 116, 123 (2d Cir. 1998).  This requires the court to consider the evidence in the light most favorable to

the government and to draw all permissible inferences that the jury may have drawn in the government's favor.  _Jackson_, 335 F.3d at 180.

Consistent with this deference, a jury verdict must be upheld if "_any_ rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  See id. (quoting _Jackson v. Virginia_, 443 U.S. 307, 319 (1979) (emphasis in original)).  Moreover, the jury's verdict will be upheld even when it is based entirely on inferences from circumstantial evidence.  _United States v. Mariani_, 725 F.2d 862, 865-66 (2d Cir. 1984); see also _United States v. Lorenzo_, 534 F.3d 153, 159 (2d Cir. 2008) ("[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt'") (quoting _United States v. Rodriguez_, 392 F.3d 539, 544 (2d Cir. 2004)).  Finally, a court reviewing the sufficiency of the evidence must be careful not to analyze particular pieces of evidence in isolation, but instead should consider the evidence in its totality.  See _United States v. Rosenthal_, 9 F.3d 1016, 1024 (2d Cir. 1993).

Only where the evidence that the defendant committed the crime alleged is either "nonexistent or so meager that no

reasonable jury could find guilt beyond a reasonable doubt" may a district court grant a Rule 29 motion.  <u>Guadagna</u>, 183 F.3d at 130 (internal quotations omitted).  Consequently, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient" under Rule 29. <u>United States v. Aleskerova</u>, 300 F.3d 286, 292 (2d Cir. 2002). However, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." <u>United States v. Glenn</u>, 312 F.3d 58, 70 (2d Cir. 2002) (internal citations omitted).

### B. Application

Scarlato argues that (1) Count Six fails for lack of venue; (2) Count Seven fails for insufficient evidence, and (3) the evidence was insufficient to establish Scarlato's intent to defraud the investors, a necessary element of all seven counts of the Indictment.  (<u>See</u> Scarlato Mem., <u>see also</u> Scarlato Reply Mem.)  Without citation to the record, Reisman argues summarily that "Reisman never participated in the fraudulent acts of Kahale, et al.  Reisman is innocent of the instant charges." (<u>See</u> Reisman Mem. at 7.)  Kahale and Graham join these arguments as applicable.  (<u>See</u> Kahale Ltr., Graham Ltr.)

### 1. The Venue Objection Fails

In his Rule 29 motion, Scarlato contends for the first time that Count Six fails for lack of venue because the evidence at trial showed that Count Six concerned criminal activity occurring entirely outside the Eastern District of New York. (Scarlato Mem. at 3.)  The government counters that Scarlato's venue objection is untimely, and therefore waived.  (Gov. Mem. at 16-17.)

A defendant is entitled to be tried in the place where the criminal acts allegedly occurred.  <u>See</u> <u>United States v. Cabrales</u>, 524 U.S. 1, 5 (1998) ("Both Rule 18 of the Federal Rules of Criminal Procedure[7] and the Constitution[8] require that a person be tried for an offense where that offense is committed.") (internal citations and quotations omitted).  For mail and wire fraud offenses proper venue lies in "any district" in which the offense "was begun, continued, or completed." 18 U.S.C. § 3237(a);  <u>see also</u> <u>United States v. Kim</u>, 246 F.3d 186,

---

[7]     Rule 18 of the Federal Rules of Criminal Procedure provides, in relevant part:

> the government must prosecute an offense in a district where the offense was committed.  The court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice.

[8]     Article 3, Section 2, clause 3 of the Constitution provides, in relevant part that "the Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  The Sixth Amendment also requires that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by a jury of the State and district wherein the crime shall have been committed."

191 (2d Cir. 2001) (affirming district court finding that 18 U.S.C. § 3237(a) is "the appropriate venue provision" for wire fraud charges).

Given the strong "constitutional underpinning and importance of proper venue," the Second Circuit has instructed that the waiver of venue objections "should not be readily inferred." United States v. Novak, 443 F.3d 150, 161 (2d Cir. 2006) (quoting United States v. Price, 447 F.2d 23, 27 (2d Cir. 1971)). Nonetheless, in Price, the Second Circuit identified two specific circumstances where a finding of waiver of a venue objection is proper: (i) "when the indictment or statements by the prosecutor clearly reveal this defect but the defendant fails to object" before trial, (the "first Price test"); or (ii) "when after the government has concluded its case, the defendant specifies grounds for acquittal but is silent as to venue," (the "second Price test"). Price, 447 F.2d at 27.

Here, the question is whether the first Price test applies and renders Scarlato's venue objection waived.[9] Thus,

---

[9]    Scarlato's motion relies on cases pertaining to the second Price test which concerns the waiver of a venue objection absent articulation in a Rule 29 motion for acquittal. (See Scarlato Mem. at 3-4 (citing United States v. Rommy, 506 F.3d 108 119 (2d Cir. 2007) (noting that venue objections will be waived "unless specifically articulated in defense counsel's motion for acquittal") (internal citation and quotation marks omitted) and United States v. Bala, 236 F.3d 87, 96 (2d Cir. 2000) (same).) Here, however, there is no dispute that Scarlato has sufficiently articulated the basis for his venue objection in his Rule 29 motion. Rather, the court's inquiry focuses on whether the alleged venue defect was apparent on the face of the Indictment and therefore waived prior to trial under the first Price test. See Novak, 443 F.3d at 161 ("When the defect in venue is apparent on the face of the

the court must determine whether the "indictment and statements
of the prosecutor" in this case "reveal[ed]" the venue defect to
defendants prior to trial.  See Price, 447 F.2d at 27.  Both
parties rely on Novak, 443 F.3d 150, to answer this question.
The government contends that the venue defect was apparent on
the face of the Indictment because it plainly alleged that the
crime in Count Six took place "in the Western District of New
York." (Gov. Mem. at 16-17.)  Therefore, the government argues
that the first Price test applies and the venue objection is
waived.  (Id.)  In response, and also relying on Novak, 443 F.3d
at 162, Scarlato argues that the objection is timely because the
Indictment was ambiguous in that it alleged that the conduct in
Count Six took place not only "in the Western District of New
York" but also *elsewhere*."  (Scarlato Reply Mem. at 4.)
Scarlato argues that this language induced Scarlato's reasonable
belief that the government would adduce some evidence at trial
indicating that some of the criminal conduct alleged in Count
Six took place "elsewhere," including in the Eastern District of
New York.  (Id.)

        In Novak, the district court rejected as untimely a
defendant's venue objection which was first raised on a Rule 29

---

indictment, a defendant waives the right to contest the issue if he or she
fails to object prior to trial. It follows that, when a venue defect is not
clear on the face of the indictment, a defendant may raise the objection for
the first time in a motion for acquittal at the close of the government's
evidence.")

motion for a judgment of acquittal.  443 F.3d at 160.  The
Second Circuit reversed, finding that the venue objection was
timely because in that case the "venue defect was not evident on
the face of the indictment" because "nothing in [defendant]
Novak's indictment precluded the conclusion that at least some
of the charged criminal activity occurred in the Eastern
District of New York."  Id. at 162.  Thus, the Court held that
because Novak's indictment alleged that the criminal conduct
occurred "in the Southern District of New York and elsewhere,"
there was nothing to preclude Novak's reasonable belief "that
the 'and elsewhere' language meant that the government intended
to produce some evidence at trial linking [Novak's] crimes to
both the Southern and Eastern Districts."  Id. at 161-62.

        In its analysis, the Second Circuit considered and
distinguished the facts in Novak from a Ninth Circuit case which
the Second Circuit acknowledged properly found the waiver of a
venue objection.  See id. (discussing United States v. Johnson,
297 F.3d 845 (9th Cir. 2002)).  The Second Circuit observed that
the indictment in Johnson ("Johnson indictment") contained
ambiguous language similar to Novak in that the Johnson
indictment similarly alleged that the charged wire fraud conduct
"took place in the District of Arizona and elsewhere."  Novak,
443 F.3d at 161-62 (emphasis added).  However, the Second
Circuit found that the Johnson indictment contained a "clarity"

lacking from Novak's case because the Johnson indictment also
included detailed information regarding the origins and
destinations of each alleged "offending telephone call."  Id.
Thus, on its face, the Johnson indictment "contained all of the
facts relating to the *situs* of the crimes charged," and the
indictment itself therefore exposed the venue defect by
revealing that none of the charged criminal conduct took place
in the District of Arizona where the case was venued.  See id.

Here, the facts are analogous to Johnson, rather than
Novak, and accordingly the reasoning of Johnson – which was
distinguished and cited approvingly by the Second Circuit in
Novak – controls.  Thus, although the Indictment here alleged
that the criminal conduct charged in Count Six occurred "in the
Western District of New York and elsewhere," even a cursory
examination of the remaining language in Count Six of the
Indictment reveals that the offending conduct charged in Count
Six exclusively occurred in Falconer, New York and Slatington,
Pennsylvania, and thus nowhere within the Eastern District of
New York.  (See Ind't ¶¶ 18-19.)  The defect in venue here was
thus apparent on the face of the Indictment, the first Price
test applies, and the Scarlato's venue objection, first raised
in his Rule 29 motion, is untimely and was waived.  See Price,
447 F.2d at 28 ("On the record as a whole . . . defendant's
waiver of any defect in venue is manifest.  Despite clear notice

and actual knowledge of the presumed defect before trial commenced, [the defendant] never moved to dismiss the indictment on this basis."); see also United States v. Lazala, 260 Fed. App'x 351, 354 (2d Cir. 2008) (finding venue argument waived where "alleged venue defect was obvious in light of the indictment and the statements made by the government during the first pre-trial conference, and [defendant] failed to raise any objection to venue until after the government rested at trial"); United States v. Khan, 821 F.2d 90, 93 (2d Cir. 1987) ("Since the defect was apparent on the face of the indictment, [defendant's] failure to object prior to trial constituted a waiver of the lack of venue.").[10]

### 2. The Evidence on Count Seven is Sufficient

Count Seven charged wire fraud in connection with Amankwah's $50,000 loan to B.I.M.  (See Ind't ¶¶ 20-21.) Specifically, the evidence at trial showed that Count Seven involved the $90,000 wire transfer used partly to repay Amankwah $67,300 (from funds obtained from Stern) after Amankwah threatened to Reisman to contact federal authorities.  (See Tr.

---

[10]     Without any elaboration, Scarlato alleges that "none of the trial counsel for any defendant recognized [the venue] issue" prior to trial which he claims "can only be attributed to an unprofessional error by prior counsel to the defendant's prejudice" that gives rise to a claim of constitutionally ineffective assistance of counsel.  (Scarlato Reply Mem. at 4.)  However, ineffective assistance claims requiring further factual development are more properly raised in habeas corpus proceedings pursuant to 28 U.S.C. § 2255. See Massaro v. United States, 538 U.S. 500, 504-05 (2003).  Accordingly, Scarlato should bring those claims in that forum.

605, 617–20, 2/11/10 Tr. 1189–91, GX 65, 153, 153A, 154, 154A.)

Scarlato claims that the evidence on Count Seven is insufficient

as to him because there was no evidence: (i) that Scarlato was

directly involved in soliciting Amankwah's investment, (ii) that

Scarlato directly received any of Amankwah's $50,000 investment,

(iii) that "Reisman's wire" of funds to Scarlato following

Amankwah's investment made "Scarlato a participant in Count

Seven," or (iv) that Scarlato caused Reisman to solicit Stern's

investment, caused Stern to invest funds with Reisman that would

be used to repay Amankwah, or helped or authorized Reisman's

wiring of Stern's money to repay Amankwah.  (See Scarlato Mem.

at 4.)

        Viewing the record as a whole, the evidence at trial

was sufficient for a jury to find that Scarlato acted with

intent to defraud Amankwah and supports his conviction on Count

Seven.  Amankwah testified that he first met Scarlato at

Reisman's office and that Scarlato told Amankwah that he and

Reisman were trade partners who both worked for B.I.M.  (Tr.

614-15, 654.)  Thus, although Scarlato correctly points out that

the evidence showed that Scarlato was not directly involved in

soliciting Amankwah's $50,000 loan to B.I.M. (Tr. 640), the jury

could permissibly have inferred that as Reisman's trade partner,

Scarlato knew of, and indeed intentionally participated in,

Reisman's efforts to defraud Amankwah through a fraudulent

investment in B.I.M.  This inference is bolstered by several pieces of evidence at trial.

First, the evidence showed that Scarlato received $44,000 of Amankwah's money from Reisman, although Scarlato later claimed that he was unaware that the money had originally come from Amankwah.  (Tr. 613-15, 2/11/10 Tr. 1189-90, GX 135, 135A.)  Thus, although no evidence showed Scarlato's direct participation in soliciting Amankwah's investment, the fact that Scarlato shared and enjoyed the fruits of that investment supports the jury's permissible inference that Scarlato was aware of Amankwah's investment and intended to defraud Amankwah, regardless of Scarlato's later claims to Amankwah that he lacked knowledge about the source of the funds (Tr. 615).

Second, the evidence showed that after learning from Reisman that Scarlato – rather than B.I.M. — had obtained a substantial portion of Amankwah's investment, Amankwah approached Scarlato and demanded the return of his money.  (Tr. 614-15, 654.)  In response, Scarlato professed his innocence and his lack of awareness that the $44,000 he had received from Reisman in fact came from Amankwah.  (Tr. 615.)  Yet in apparent contradiction of these statements, and in furtherance of the criminal conduct charged in Count Seven, the evidence shows that Scarlato then made incremental payments to Amankwah over a period of months.  (Tr. 664, DX L.)  Based on this evidence, a

rational jury could have inferred that despite Scarlato's claims that he did not know the source of the $44,000 he received from Reisman, Scarlato did in fact know that the money came from Amankwah because he otherwise would have declined to send Amankwah money following this confrontation. Further, a rational jury could permissibly infer that Scarlato's payments to Amankwah were intended to placate Amankwah and forestall Amankwah's resort to law enforcement as he had threatened Reisman, Scarlato's trade partner.

Third, the evidence showed that at this same time, Scarlato gave Amankwah additional "depth" regarding B.I.M. and "grandmaster" Kahale, participated in a telephone call with Kahale and Amankwah, and gave Kahale's phone number to Amankwah. (Tr. 658-59.) This additional evidence shows that Scarlato took an active role in communicating with Amankwah following his investment and made efforts to reassure Amankwah regarding the soundness of the B.I.M. investment, all of which support the inference that Scarlato was fully aware of and intentionally participated in the criminal conduct charged in Count Seven.

Finally, the evidence also showed that eventually Scarlato refused to continue paying Amankwah, at which point Amankwah again threatened Reisman that he would go to law enforcement, and Reisman then obtained Stern's investment and used it to fully repay Amankwah through a wire transfer of

funds. (Tr. 605, 616-20, 662, 2/11/10 Tr. 1190-91, GX 65, 154,

154A.)  Based on this evidence, the jury could further have

inferred that even without Scarlato's direct involvement,

Reisman's action in repaying Amankwah – which eliminated the

need for Scarlato's continued incremental payments to Amankwah

and prevented Amankwah's reporting all defendants to the federal

authorities – was taken in concert with, and for the benefit of,

not only Reisman, but all defendants, including Scarlato.

Moreover, there can be no doubt that Reisman's use of the wires

was reasonably foreseeable under the circumstances.  (See

Scarlato Reply Mem. at 5 (citing United States v. Zichettello,

208 F.3d 72, 106 (2d Cir. 2000) (noting that wire fraud

conviction requires that showing that one "transmits or causes

to be transmitted" and one "causes" a wire transmission where

one knows or reasonably can foresee that use of the wires will

follow).)

Together, and considering all of this evidence in the

light most favorable to the government, this evidence

sufficiently established Scarlato's intent to defraud Amankwah.

See  Mariani, 725 F.2d at 865-66 (noting that jury's verdict

will be upheld even when it is based entirely on inferences from

circumstantial evidence).  Therefore, Scarlato's motion for a

judgment of acquittal on Count Seven is denied.  See Jackson,

335 F.3d at 180 (jury verdict must be upheld if "*any* rational

48

trier of fact could have found the essential elements of the crime beyond a reasonable doubt")(internal quotation omitted).

### 3. The Jury Permissibly Concluded that Each Defendant Possessed the Requisite Intent to Defraud

#### a. Legal Standard for Intent to Defraud

The elements of mail and wire fraud violations are essentially the same:  "(1) a scheme to defraud, (2) to get money or property, (3) furthered by the use of interstate mail or wires." United States v. Autori, 212 F.3d 105, 115 (2d Cir. 2000).  To establish a scheme to defraud under the first element, the government must prove "(i) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant, and (iii) the materiality of the misrepresentations." United States v. Pierce, 224 F.3d 158, 165 (2d Cir. 2000) (citations omitted).  Further, to prove scienter or fraudulent intent, "the proof must demonstrate that the defendant had a conscious, knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim." Guadagna, 183 F.3d at 129 (internal citations and quotation omitted).  Thus, "good faith" is a "complete defense to wire fraud" and, by extension, mail fraud.  United States v. Dupre, 462 F.3d 131, 139 (2d Cir. 2006); see also United States v. Shellef, 507 F.3d 82, 108 (2d Cir. 2007) ("Because the mail fraud and the wire fraud statutes

use the same relevant language, we analyze them the same way.")
(citation omitted).  However, proof of fraudulent intent may be
established solely through circumstantial evidence.  <u>See</u>
<u>Guadagna</u>, 183 F.3d at 129.

### b. Application

Under the first element, Scarlato, joined by Graham
and Kahale, does not contest the actual existence of the scheme
to defraud or the materiality of the misrepresentations made to
B.I.M. investors and lenders, but instead solely contests the
sufficiency of the government's proof with respect to his
scienter or fraudulent intent.  (<u>See</u> Scarlato Mem. at 2-3.)

Thus, Scarlato does not contest that, viewed in the
light most favorable to the government, a rational juror could
have found the existence of a scheme to defraud B.I.M. investors
and lenders with broad outlines as follows:  To secure
investments, the defendants hailed B.I.M.'s status as a large
mining concern which owned or controlled assets including gold
and other precious minerals in various parts of the world such
as the Philippines or Mexico, cited B.I.M.'s need for investor
funds to recover those assets, touted Kahale's military
background and government connections as means to facilitate the
recovery of such assets, misrepresented Reisman's status as a
C.P.A., and assured potential investors that they themselves or

their family members had invested in the project, and that an investment in B.I.M. would lead to guaranteed returns in a matter of days or months. In exchange for many investors' money, the defendants offered fraudulent Gold Delivery Certificates promising the same as security. Yet when the investments matured or the Gold Delivery Certificates indicated that redemption was due, instead of gold or cash the defendants delivered letters and e-mails containing a litany of excuses to investors and lenders for the delays in redemption. Finally, none of the investors – save one who threatened to go to the police and who was repaid by another investor's money – ever recovered either their original investments or the promised returns on their investments.

Scarlato further does not contest that a rational juror could have concluded beyond a reasonable doubt based upon the evidence adduced at trial, that in fact, defendants' representations about B.I.M.'s size and assets, Kahale's military status, Reisman's status as a C.P.A., the defendants' own stakes in the venture, and the "guaranteed" nature of investments with B.I.M. were materially false and misleading.

Rather, Scarlato solely disputes his knowledge as to the falsity of these representations. However, as set forth below, the evidence adduced at trial provided sufficient basis for a rational trier of fact to conclude, beyond a reasonable

doubt, that each defendant possessed the fraudulent intent required for their convictions on all counts in the Indictment.

### i. Kahale

Kahale joins his co-defendants' motions without raising any individual arguments. (Kahale Ltr.) However, because there was abundant evidence Kahale's integral role in the conspiracy to defraud and his knowledge of its fraudulent purposes, Kahale's generalized objection to the sufficiency of the evidence fails.

The testimony of several witnesses established that Kahale directly solicited investors including Wetmore, Vacchani, Valentini, and Wong, even after it was apparent that other investors had not been repaid, (Tr. 59-61, 303, 307, 813-14, 828-29), secured investments with fraudulent Gold Delivery Certificates bearing his own signature (GX 2, 24, 64, 70-73, 78-81, 81A, 223), and took an active role in assuaging disgruntled B.I.M. investors such as Wetmore, Amankwah and Valentini, who had failed to receive their guaranteed returns from B.I.M. within the promised timeframe (see, e.g., Tr. 68-69, 71, 121-22, 125, 231-32, 205-06, GX 11-20, 13A, 22, 24, 26, 27). Based on this evidence, the jury could permissibly infer that Kahale himself made and also witnessed misrepresentations about B.I.M.'s size and assets and his own background and connections

to both potential and existing B.I.M. investors which he well knew to be patently false.

Ample evidence allowed a rational juror to conclude that Kahale knew the falsity of the representations regarding B.I.M.'s size, operations, and assets. First, Kahale was the President, Chief Executive Officer, and Treasurer of B.I.M. (See, e.g., GX 2, 75.) Aside from Graham, who served as B.I.M.'s Secretary and a Director, there was no evidence that B.I.M. had any other officers or employees. (See 2/12/10 Tr. 1128-61, GX 2, 217, 226, DX V.) Further, evidence showed that B.I.M. operated out of the same small office space in Las Vegas which was used by Graham as a home (Tr. 1431-33, GX 217), and that B.I.M. could not produce any documents evidencing its right or access to gold or other mineral resources (2/13/10 Tr. 1124-61, GX 217, 226, DX V). Moreover, Johnson, called by the defense, testified unequivocally that B.I.M. did not have rights to any gold based on contracts with Western Sierra Mines because B.I.M. never paid on its single forward delivery contract with that company. (Tr. 1488-92.) Finally, Kahale was a signatory on B.I.M.'s bank account (2/11/10 Tr. 1177) the contents of which was comprised mostly of investor money (GX 201), from which the primary expenditures were withdrawals and checks made out to cash (2/11/10 Tr. 1196-97, GX 151, 151A-D), and from which no meaningful transactions involving gold were derived

(id.).  Weighing this evidence together, the jury could
permissibly infer that Kahale understood the status of B.I.M.'s
true status and operations and therefore, that he understood the
falsity of the representations about B.I.M.'s size and assets
which he and others were making to investors (see, e.g., GX 91,
91A).

Sufficient evidence also permitted a rational juror to
infer that Kahale had knowledge of the falsity of the
representations about his own military status.  The evidence at
trial showed that while Kahale and his co-defendants referred
extensively to Kahale's high military rank (see, e.g., Tr. 62,
810, GX 75), far from being an active Two-Star General, Kahale
was in fact honorably discharged from the Army in 1965 at the
rank of Sergeant (Tr. 868-69, GX 215).  A reasonable jury could
therefore infer that Kahale had knowledge of the falsity of his
and others' representations regarding his own military
background.

Ultimately, this evidence permitted a rational jury to
infer that because Kahale knew the true nature of B.I.M.'s size
and business operations and his own military status, Kahale well
knew and understood the falsity of defendants' promises to
investors that their investments in B.I.M. would yield
significant returns within specified time frames.  Sufficient
evidence thus permitted the jury to infer that Kahale had

knowledge of the misrepresentations at the heart of the bargain between the investors and the defendants and to therefore conclude beyond a reasonable doubt that Kahale possessed the requisite scienter. Kahale's Rule 29 motion is therefore denied.

### ii. Graham

Graham argues that even viewed in the light most favorable to the government, there was insufficient evidence that Graham had "knowledge of the falsity of any representation that he made or that he knew of being made in connection with B.I.M." (Tr. 1171, Graham Ltr.) In support of this argument, Graham notes that many of the government's witnesses who were themselves sophisticated and experienced businessmen and investors also believed the representations that they heard about B.I.M. (Id.) Further, Graham asserts that the testimony of the witnesses reveals that any misrepresentations made by Graham himself were actually "based on information about what other people were doing, information that [Graham] was told." (Id.) However, sufficient evidence at trial permitted a rational juror to infer that not only was Graham actively involved in the scheme to defraud, but that also – unlike the investors to whom he compares himself – Graham fully understood the falsity of the representations made in connection with

B.I.M. and therefore possessed the requisite fraudulent intent
to further the fraudulent scheme.

First, like Kahale, the evidence showed that Graham
personally took an active role in the scheme to defraud.  For
example, the evidence showed that Graham participated in at
least one conference call with Wetmore in connection with
Wetmore's second $200,000 investment in B.I.M. regardless of
whether Wetmore recalled specific representations made by
Graham.  (Tr. 59-61.)  In addition, Graham signed each of the
Gold Delivery Certificates which promised significant returns
within a specific time frame and which were both used to solicit
investors (Tr. 52, 582-85, 657, GX 2, 60, 64) and issued to
B.I.M. investors to purportedly secure their investments in
B.I.M. (GX 2, 24, 64, 70-73, 78-81, 81A, 223).  In addition, one
such Gold Delivery Certificate which referred to the El Picacho
Mine in Mexico and was shown to investors to encourage B.I.M.
investments bore a typewritten notation beneath Graham's
signature: "Based on mining contracts with Western Sierra Mining
Inc. and B.I.M. Mining Corp."  (Tr. 52, 582-85, 657, GX 2, 64).
Further, Graham took an active role in placating investors whose
investments were overdue for redemption.  The evidence showed
that Graham authored a number of Investor Update Letters (GX 11-
20), communicated with investors over the phone (Tr. 317-19,
321), and sent and was copied on e-mails with investors (GX 13A,

21, 22, 25-27).  For example, Vacchani testified that Graham
reassured him about Vacchani's B.I.M. investments via e-mail
(Tr. 314, GX 103), telephone (Tr. 317-19, 321), and on one
occasion in person when Vacchani travelled to Las Vegas to
obtain a personal guarantee from Kahale which was witnessed by
Graham (Tr. 317-19, GX 98A).

Second, despite Graham's protestations that any
representations he made were based on information "told" to him
by others, the evidence at trial was sufficient to permit a
rational jury to infer that Graham well knew the falsity of
those representations.  Like Kahale, Graham's role as an officer
of the company, namely, as Secretary and a Director of B.I.M.
(see, e.g., GX 2), Graham's status as a signatory on B.I.M.'s
bank account (2/11/10 Tr. 1177), and the evidence showing that
B.I.M. operated out of Graham's small office/home on Flamingo
Road in Las Vegas (Tr. 1431-32, GX 217) also support an
inference that Graham had personal knowledge of B.I.M.'s true
size, business operations, and assets, which were misrepresented
in Graham's and B.I.M.'s communications with investors and on
the Gold Delivery Certificates signed by Graham.  Further, the
evidence that B.I.M.'s April 2004 financial statement bears
B.I.M.'s letterhead and lists its address as Graham's Flamingo
Road office/home, and the negligible response B.I.M. made to the
government's subpoena for documents, also supports the jury's

permissible inference that Graham had knowledge of the false representations contained in B.I.M.'s 2004 financial statement (GX 91), the 2004 Gold Delivery Certificate indicating in a typewritten note beneath Graham's signature that B.I.M. possessed assets under contract with Western Sierra (GX 2), and the many investment update letters and e-mails signed by or copied to Graham.  Based on this evident knowledge, the jury could infer Graham's fraudulent intent in publishing those many false documents to potential investors.

Finally, and also similar to Kahale, the timing of Kahale and Graham's solicitation of the investments from Wong (Tr. 504, 546, 551, 554, GX 107, 239), just three weeks after sending yet another Investor Update Letter to Wetmore justifying the delay in Wetmore's redemption of his overdue Gold Delivery Certificate (GX 19), strongly suggests that Graham had knowledge of the falsity of the representations being made to the Wongs by Kahale, which Graham witnessed, acknowledged and agreed with (Tr. 496-98, 544-45).

This evidence was more than sufficient for the jury to properly conclude that Graham possessed the requisite fraudulent intent for his conviction on all counts.  Graham's motion for a judgment of acquittal is therefore denied.

### iii.    Scarlato

Scarlato claims that the evidence was insufficient to convict him beyond a reasonable doubt on the issue of scienter because (i) the evidence did not rebut that Scarlato possessed a good faith belief in the representations he and others made with respect to B.I.M. and Kahale's background; and (ii) there was no proof that Scarlato "contemplated actual harm or injury to the investors." (Scarlato Reply Mem. at 1-3.)  However, the evidence, considered together and in the light most favorable to the government, was sufficient to establish Scarlato's fraudulent intent.

Scarlato narrowly – and incorrectly – construes the Indictment as charging solely that "Scarlato knew that B.I.M. Mining did not need funds to process overseas assets." (Scarlato Reply Mem. 1.)  To the contrary, the Indictment charged a number of false representations by defendants in connection with the overarching scheme to defraud (see Ind't ¶¶ 11-15),[11] and any fair reading of the Indictment gives notice of

---

[11]    In fact, the Indictment charged that as part of the overall scheme to defraud, the defendants made misrepresentations to investors and lenders in connection with: (i) B.I.M.'s size and business operations (Ind't ¶ 12); (ii) the defendants' own backgrounds and business contacts (id.); (iii) B.I.M.'s possession of assets including gold and other precious metal resources (id. ¶ 11); (iv) B.I.M.'s need for funds to process, transport and market those assets from abroad (id.); (v) the promise that the Gold  Delivery Certificates issued by B.I.M. would bring the bearers "large sums of money upon maturity" (id. ¶ 13); (vi) the reason for the delays in redeeming the Gold Delivery Certificates (id. ¶ 14); and (vii) the expectation that after those delays the Gold Delivery Certificates would be "redeemed soon" for a "profitable return" (id.).

this overarching scheme which cannot, and need not, be reduced to any single charged misrepresentation. See United States v. LaSpina, 299 F.3d 165, 182 (2d Cir. 2002) ("[I]n the context of a conspiracy charge, 'the Government need not . . . set out with precision each and every act committed . . . in furtherance of the conspiracy,' particularly where the acts proven at trial were part of the 'core of the overall scheme and in furtherance of that scheme.'") (quoting United States v. Cohen, 518 F.2d 727, 733 (2d Cir. 1975)).

Rather, the crux of the scheme to defraud charged in the Indictment was defendants' false promises to investors and lenders that their investments in B.I.M.'s gold recovery efforts would be used to recover or process gold and other assets and yield significant 'guaranteed' and 'risk-free' returns within a period of days or months.[12] The evidence at trial provided

---

[12] Although not raised by the parties, to the extent Scarlato's motions can be construed as arguing a constructive amendment of the Indictment or prejudicial variance, the court finds the arguments meritless. No constructive amendment occurred because the evidence at trial concerned the same "elaborate scheme to defraud investors as was alleged in the Indictment." See United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983) cert. denied, 466 U.S. 962 (1984) (rejecting constructive amendment claim where the participants, victims, subject, and nature of the fraudulent scheme proved were the same as those alleged in the indictment); see also Dupre, 462 F.3d at 140-41 (same). In addition, the court finds that there was no variance because the Indictment placed defendants on notice that the core of criminality charged was that defendants fraudulently enticed victims to invest in B.I.M. with promises of guaranteed returns which then never materialized. See Heimann, 705 F.2d at 666 (rejecting claim of variance and noting that "[b]ecause proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment, this court has consistently permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial") (citation omitted); see also United States v. Spindona, 636 F.2d 792,

sufficient proof that (i) Scarlato knew that B.I.M. did not use funds to process or recover any gold from overseas because he knew B.I.M. was a fraud; and (ii) Scarlato intended to harm his victims to his own advantage as part of this scheme.[13]

First, regarding his knowledge of the falsity of the representations, Scarlato relies on Defendant's Exhibit G ("DX G"), a purported fee agreement between Scarlato and B.I.M., and argues that this document supports his innocent state of mind because he would not have wanted a "binding contract" with B.I.M. "if he thought he was participating in an illegal scheme to defraud" and moreover, "given that his entitlement to a large commission had B.I.M.'s written approval [according to DX G], he had no reason to doubt the project's viability despite his retaining earned commissions." (Scarlato Reply Mem. at 2-3.) This argument is unavailing. The court notes that DX G was

---

797-98 (2d Cir. 1980) (finding no variance where indictment charged defendant concealed fact that funds were obtained fraudulently while proof at trial established defendant concealed only the source of the funds). Further, even if the court were to assume the existence of a variance, such variance would not be legally significant because the "allegation and proof substantially correspond" and therefore no prejudice resulted. Dupre, 462 F.3d at 141-42 (finding no prejudicial variance even where "the particular wire transfer identified in the [conspiracy charge in the] indictment was not proven at trial" but other wire transfers were proved) (citation omitted).

[13]    Even assuming, *arguendo*, that Scarlato's narrow interpretation is correct, and that the Indictment "did not charge [Scarlato] with falsely representing that the funds would be used in gold recovery operations," but merely with falsely representing that B.I.M. needed investors funds to process or recover gold from overseas assets, the evidence at trial would still be sufficient to prove Scarlato's knowledge and intent to harm in connection with these misrepresentations given the adequate evidence from which the jury could have inferred his knowledge of the overall fraudulent nature of the B.I.M. project.

admitted for all purposes (2/11/10 Tr. 1249), published to the
jury at trial (see, e.g., 2/11/10 Tr. 1210-11), and argued for
its truth by Scarlato's counsel on summation (Tr. 1881). Thus,
after adequate opportunity to consider this evidence and
counsel's arguments, the jury rejected Scarlato's proposed
inference that Scarlato lacked fraudulent intent based upon his
understanding of DX G, and permissibly so. Indeed, ample
evidence from trial permitted a rational juror to conclude
beyond a reasonable doubt that Scarlato had every reason to
doubt the viability and legitimacy of B.I.M.'s overseas gold
recovery and processing projects and indeed, understood that
these projects, and hence, the concomitant need for and use of
the funds to support them, were a fraud. See Dupre, 462 F.3d at
138-39 ("[Defendant's] assertion that she trusted in the Roberta
Project's legitimacy and lacked an intent to defraud does not
convince us that no rational juror could have believed beyond a
reasonable doubt that [the defendant] knew the project for what
it was – a fraud.")

        The timing and content of Scarlato's solicitation of
investors is critical to this analysis. The evidence at trial
showed that Scarlato was prolific in his recruitment of
investors for B.I.M., promising guaranteed returns and profits
to solicit either alone or with other defendants: Wetmore (for
his second investment), Vacchani, Peter Valentini, Joseph

Valentini, Valenzano, and Dolan, for total investments of at least $624,000.[14]  According to the evidence at trial, Scarlato was first involved in soliciting Wetmore's $200,000 B.I.M. investment in the fall of 2004.  (Tr. 59.)  However, just a few months later, in early 2005, Scarlato was approached by Amankwah, who had already threatened to go to the police when he did not receive a return on his B.I.M. investment within the promised time frame.  (Tr. 614-16, 654.)  As discussed above, the evidence showed that Amankwah complained to Scarlato regarding the lack of return on Amankwah's B.I.M. investment, explained that Reisman had represented that Scarlato had received $44,000 of Amankwah's money, and demanded that Scarlato return money to Amankwah.  (Id.)  Thus, as early as the beginning of 2005, Scarlato was on notice that B.I.M.'s 'guaranteed' investments were not producing returns as promised.

Just a few months later, in July 2005, Scarlato was on further notice of B.I.M.'s inability to deliver its promised returns when B.I.M. failed to pay on Wetmore's November 2004 investment.  (Id. 68-69.)  At that time, Scarlato participated in a phone call with Wetmore, Kahale, and Graham, where the defendants made excuses for the delay and Scarlato offered

---

[14]    In addition, as noted *supra* Section I.B.2, strong circumstantial evidence also suggests Scarlato's indirect involvement in soliciting Amankwah.

Wetmore a Gold Delivery Certificate as collateral for Wetmore's prior $200,000 investment.  (Id. 68-69, 121-25, 231-32, GX 24.)

Moreover, at this time Scarlato was representing to investors that he personally invested in B.I.M. and was using investor funds for personal purposes including the purchase of a new pickup truck, and was likely aware that Reisman was also using investor funds for personal use given that Scarlato was aware of Wetmore's initial $100,000 investment through Reisman. (Tr. 150, 160-63.)  "[J]urors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."  See United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).  Here, relying on their common sense, jurors would be permitted to infer from the fact that Scarlato used B.I.M. investment funds for personal use that Scarlato did not in fact subscribe to a good faith belief that B.I.M. was using investor funds to recover gold and other assets, and in fact, that he knew that such representations were false.  Such an inference logically would follow from the common sense notion that if Scarlato truly subscribed to a belief that B.I.M. possessed significant gold assets "on the ground" in remote locations around the world and merely needed investor money to bring those assets back to the United States with substantial guaranteed returns resulting in a matter of days or months, Scarlato would not hamper B.I.M.'s enterprise by siphoning off a

substantial portion of the required funds for personal use, notwithstanding Scarlato's view that his purported B.I.M. fee agreement "entitle[d]" him to a large "commission." Indeed, common sense and experience would even further support the jury's finding where, as here, Scarlato's own purported investment in Gold Delivery Certificates, if true, assured that he would shortly share in the promised rewards from the completed project in an amount greater than the personal fees deducted. (See Tr. 986-987.)

Together, this series of events gave the jurors a basis to find that Scarlato had ample reason "to doubt the legitimacy of the scheme." See Dupre, 462 F.3d at 138-39. Yet Scarlato continued to solicit additional investors for B.I.M. and falsely portrayed the investments as "no risk" and "guaranteed." (Tr. 810-11, 986, 989.) Thus, in the summer of 2005, Scarlato solicited an investment from Valenzano, in October 2005 he solicited investments from father and son Valentini, and in November 2005 he solicited Vacchani's investment.

Based upon all of this evidence, a rational jury could have inferred that while soliciting these B.I.M. investments Scarlato well knew that B.I.M. was a fraud and that therefore, Scarlato knew that the representation that B.I.M. need or would use investor funds to extract gold from overseas was false.

Thus, the evidence at trial sufficiently established proof from which a rational juror could conclude beyond a reasonable doubt Scarlato's knowledge of the falsity of these representations.

Second, there is also sufficient proof from which a rational juror could conclude beyond a reasonable doubt that Scarlato possessed the requisite intent to harm his victims. To establish fraudulent intent, the government must show more than a mere intent to deceive, but "that some actual harm or injury was *contemplated* by the schemer." See United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir. 1970). However, such proof does not require proof of actual harm. See id. Yet where proof does exist "that someone was actually victimized by the fraud," this constitutes "good evidence of the schemer's intent." Id. at 1181. The schemer's intent to harm may also be inferred when a fraudulent "scheme has such effect [of harming its victims] as a necessary result of carrying it out." Id. (internal citation and quotation omitted). In other cases, fraudulent intent may be "apparent" where "the false representations are directed to the quality, adequacy or price of the goods themselves . . . because the victim is made to bargain without facts obviously essential to the bargain." Id. at 1182. Finally, fraudulent intent may also be "inferable from facts indicating a discrepancy between benefits reasonably anticipated because of the misleading misrepresentations and the

actual benefits which the defendant delivered, or intended to deliver." Id.

Here, the jury could have inferred Scarlato's intent to harm on any number of grounds. First, the evidence at trial showed that numerous people, including Wetmore, Vacchani, Peter Valentini, Joseph Valentini, Valenzano, and Dolan – all individuals directly solicited by Scarlato – were victimized by the fraud. None of these investors received any return on their B.I.M. investments and lost tens, if not hundreds of thousands of dollars while Scarlato enjoyed significant portions of those funds for his own use. (See GX 150, 150A-E, 155, 156, 157.) This fact alone strongly supports an inference of Scarlato's intent to harm. See Regent Office Supply Co., 421 F.2d at 1181. Second, the evidence showed that by carrying out the overall scheme to defraud, harm to victims necessarily would result, and this evidence further supports an inference of intent to harm. See id.

Finally, the evidence showed that Scarlato represented to the investors that their money would be used for B.I.M.'s gold recovery operations (see Tr. 63-65, 303, 695-96, 809-811, 986, 998), and never disclosed that he would withhold a commission or fee from their investments (see id. 88, 96-97, 322-23, 696, 833-34, 987), but in fact used substantial portions of the investments for his personal purposes (see GX 150, 150A-

E, 155, 156, 157). Scarlato's misrepresentations through
omission regarding his hefty "commissions" certainly caused a
"discrepancy" between benefits reasonably anticipated by the
investors and the benefits delivered or intended to be delivered
by Scarlato and the other defendants. See Regent Office Supply
Co., 421 F.2d at 1182. Indeed, the investor-victims' testimony
established that they were "made to bargain without facts
obviously essential to the bargain." See id.; see also United
States v. Kinney, 211 F.3d 13, 18 (2d Cir. 2000) (finding
fraudulent intent established where "the victims of defendants'
fraud . . . were given false information about *how* their money
would be spent, and made a decision whether to donate money
based on that information" and rejecting defendants' assertion
"that these misrepresentations did not affect the [victims']
understanding of their bargain . . . and mislead them as to the
nature and quality of [the recipient charitable organization's]
activities") (emphasis in original.

     Alternatively, these misrepresentations could fairly
be characterized as directed at the "quality . . . of the goods
themselves." See id. In addition, Scarlato's false
representations about tons of gold ore and coffins full of gold
bars were directed to the quality and adequacy of the B.I.M.
investment, as were Scarlato's misrepresentations that he
personally invested thousands of his own money with B.I.M. and

that the returns were "guaranteed." Thus, a rational juror could find that Scarlato's misrepresentations regarding his "commissions" further give rise to an inference of his intent to harm because his intent was to injure the victims to his own advantage by withholding or misrepresenting material facts. See id. ("Because defendants' dishonesty was not incidental to the [victim's] decision to make donations to [the charitable organization], but rather was aimed at influencing those decisions directly, an intent to defraud was established.")

From all of this evidence, a rational juror could have concluded beyond a reasonable doubt that Scarlato possessed the requisite scienter or fraudulent intent. Accordingly, there is no basis to disturb the jury's finding and Scarlato's motion for a judgment of acquittal under Rule 29 is denied.

### iv. Reisman

Reisman's seven page memorandum in support of his post-trial motions contains a five page outline of the applicable legal standards and two pages of argument devoid of any record cites – or even extra-record cites. (See generally Reisman Mem.) Specifically, Reisman recites background information about how he claims he was introduced to B.I.M., describes his alleged diligence in investigating B.I.M. and Western Sierra, the allegedly exculpatory testimony that he was

prepared to introduce from Dr. Alan Cohler,[15] and his alleged lack of contact with the other defendants after 2005. (<u>See</u> Reisman Mem. at 5-7.) Yet Reisman cites no evidence in the record to support these assertions, and fails to explain how such evidence, even if introduced, would have exculpated him. Moreover, Reisman fails to explain the contradictory evidence that does exist in the record from Wetmore, who testified at trial, or the lack of corroborating testimony from Johnson, who also testified at trial but whose testimony fails to support Reisman's claims of his frequent contact with him.

There was ample evidence for the jury to conclude beyond a reasonable doubt that Reisman possessed the requisite intent to defraud. Even alone, the evidence that Reisman solicited Wetmore's first $100,000 investment in B.I.M. for "the production costs of processing gold" (Tr. 49-57, 143-44) but gave nothing to B.I.M. and instead kept that entire amount and used it for his personal expenses including $67,300 used to buy a house (2/11/10 Tr. 1168-69, GX 150A) and that Wetmore never recovered his investment or any profit provides sufficient basis to support the jury's rational inference that Reisman possessed the requisite fraudulent intent. See <u>Regent Office Supply Co.</u>,

---

[15]    Reisman's ineffective assistance of counsel claims in relation to this allegedly exculpatory evidence are discussed <i>infra</i>, Section II.

421 F.2d at 1181 ("proof that someone was actually victimized by the fraud is good evidence of the schemer's intent").

Moreover, the evidence that Reisman knowingly misrepresented his status as a C.P.A. (Tr. 54, 57, 1785-86; GX 1, 4, 234) also provides support for the jury's rational inference that Reisman intended to defraud his victims.  See Regent Office Supply Co., 421 F.2d at 1182. ("fraudulent intent is apparent" where "false representations are directed to the quality, adequacy or price of the goods themselves").

Because this evidence was sufficient to support Reisman's conviction, Reisman's motion for a judgment of acquittal under Rule 29 is denied.

## II.    Reisman's Rule 33 Motion

As noted, rather than contesting the evidence at trial, Reisman's motion is premised upon alleged exculpatory evidence that was not introduced at trial allegedly due to trial counsel's ineffective assistance.  (Id. 5-7; see also Reisman Reply Mem. at 1.)  The thrust of Reisman's arguments thus focuses not on the legal insufficiency of the evidence adduced at trial under Rule 29, but rather on the sufficiency of the "exculpatory" evidence which was *not* adduced at trial due to trial counsel's alleged error.  (See Reisman Reply Mem. at 1.) Accordingly, Reisman appears to principally argue for a new

trial pursuant to Rule 33.  However, for the reasons that follow, Reisman's Rule 33 motion for a new trial is denied.

### A. Rule 33 Standard

Federal Rule of Criminal Procedure 33(a) provides that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  However, "[g]enerally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003).  Although a trial court has broader discretion under Rule 33 than under Rule 29 to set aside a verdict and order a new trial, this discretion must be "exercised sparingly," "with great caution, and only in the most extraordinary circumstances."  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

Thus, the crucial question for a district court deciding a Rule 33 motion is whether "it would be a manifest injustice to let the guilty verdict stand."  Id. (citation omitted).  A "manifest injustice" occurs where a trial court cannot be satisfied that "competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted."  Id.

## B. Application

Although "newly discovered evidence" is the only ground for a new trial specifically contemplated by Rule 33, a defendant may also seek a new trial based upon a claim of ineffective assistance of counsel. Fed. R. Crim. P. 33, see also United States v. Salameh, 54 F. Supp. 2d 236, 248 (S.D.N.Y. 1999) (noting that a Rule 33 motion may be based upon an ineffective assistance of counsel claim).[16] Such a claim requires that the court inquire as to whether a defendant's legal representation was so deficient as to violate the Sixth Amendment of the Constitution. Strickland v. Washington, 466 U.S. 668, 687 (1984).

To prove ineffective assistance of counsel rising to the level of a constitutional violation, a defendant must overcome a two-prong test, first demonstrating deficient performance by counsel (the "performance prong"), and second, demonstrating that counsel's deficiency prejudiced the defense (the "prejudice prong"). Strickland, 466 U.S. at 687-88. Counsel is "ineffective" under the performance prong when

---

[16]     The Supreme Court has instructed that "in most cases a motion brought under [28 U.S.C] § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." Massaro, 538 U.S. at 504. However, despite this "general rule," the Second Circuit has noted its discretion to review such claims on direct appeal when the record is fully developed and resolution is beyond doubt. See United States v. Garcia, 413 F.3d 201, 219 n.13 (2d Cir. 2005). Because this is such a case, the court considers the claim on the instant post-verdict motion rather than awaiting a petition for habeas corpus under 28 U.S.C. § 2255.

counsel's efforts fall "below an objective standard of reasonableness." Williams v. Taylor, 529 U.S. 362, 390-91 (2000) (quoting Strickland, 466 U.S. at 688). The prejudice prong under Strickland is satisfied by proving that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Williams, 529 U.S. at 391 (quoting Strickland, 466 U.S. at 694.)

It is the accused's "heavy burden" to demonstrate a constitutional violation under Strickland. United States v. Gaskin, 364 F.3d 438, 468 (2d Cir. 2004). Moreover, in assessing an attorney's effectiveness, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Indeed, "strategic choices [by counsel] made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91.

Here, the trial transcript, court record, and this court's own recollection of the performance during trial of Reisman's trial counsel, JaneAnne Murray, Esq. ("Ms. Murray"), leave no doubt that Ms. Murray's performance at trial met, if not exceeded, any objective standard of reasonableness.  See Williams, 529 U.S. at 390-91.  The trial transcript reflects Ms. Murray's cogent opening and closing statements, appropriate interposition of objections, careful cross-examinations of several witnesses, articulate arguments both oral and written on behalf of her client's positions, and adherence to a trial strategy.  (See, e.g., 30-37, 1892-1910, 207-33, 1675-86.) Further, the court record demonstrates that Ms. Murray actively and vigorously litigated a number of evidentiary and other issues on behalf of Reisman in various filings with the court both before and during the trial.  (See generally Dkt. No. 09-cr-159.)  Finally, this court's own subjective recollection of Ms. Murray's conduct during trial is corroborated by the trial transcript and court record.

Further, to the extent Reisman argues that counsel's performance was deficient based upon her alleged failure to call Dr. Alan Cohler ("Cohler") as an exculpatory witness, his arguments fail.  (See Reisman Mem. at 7.)  First, although "the decision not to call a witness must be grounded in some strategy that advances the client's interests" rather than "animated

primarily by a desire (by counsel) to save himself labor," <u>Eze</u>
<u>v. Senkowski</u>, 321 F.3d 110, 129 (2d Cir. 2003), ultimately "the
tactical decision of whether to call specific witnesses -- even
ones that might offer exculpatory evidence -- is ordinarily not
viewed as a lapse in professional representation," <u>United</u>
<u>States v. Schmidt</u>, 105 F.3d 82, 90 (2d Cir. 1997), <u>cert. denied</u>,
522 U.S. 846 (1997).  Here, the record is clear that counsel
investigated and pursued the possibility of utilizing Cohler's
allegedly "exculpatory" testimony (Tr. 736), and rejected that
course (Tr. 972), only after reasonable investigation, rendering
counsel's choice virtually unassailable on a motion for
ineffective assistance of counsel.[17] <u>Strickland</u>, 466 U.S. at
690-91 ("strategic choices [by counsel] made after thorough
investigation of law and facts relevant to plausible options are
virtually unchallengeable"); <u>see also</u> <u>id.</u> at 689 (discussing
"strong presumption that counsel's conduct falls within the wide
range of reasonable professional assistance").

 This record establishes that counsel's performance
plainly falls within an objective standard of reasonableness.
As such, Reisman's ineffective assistance of counsel claim

---

[17] While the trial record itself makes clear that counsel's decision not
to call Cohler resulted from nothing other than a reasonable trial strategy,
the court also notes that counsel's diligent investigation of Cohler's
potential value as a defense witness is corroborated by various
contemporaneous <i>ex parte</i> submissions to the court.  (<u>See</u> ECF No. 208, Sealed
Letter dated 2/5/10; ECF No. 209, Sealed Order dated 2/5/10; ECF No. 378,
Sealed Letter dated 2/12/10.)

necessarily fails.  See Strickland, 466 U.S. at 697 ("there is

no reason for a court to . . . address both [the prejudice and

performance] components of the inquiry if the defendant makes an

insufficient showing on one").  Moreover, notwithstanding

Reisman's own conclusory assertions that Cohler was "prepared to

testify" and produce "exculpatory" documents, Reisman has

presented no evidence to suggest that allowing the guilty

verdict to stand would result in a "manifest injustice."

Sanchez, 969 F.2d at 1414.  To the contrary, and as discussed

above, the court is satisfied that "competent, satisfactory and

sufficient evidence" supports the jury's finding of guilt beyond

a reasonable doubt.  See id.

Accordingly, there is no basis for this court to order

a new trial pursuant to Rule 33, based upon a claim of

ineffective assistance of counsel or otherwise, and Reisman's

motion for a new trial is therefore denied.

### III.    Forfeiture

Having ruled on the foregoing motions and having

previously denied the defendants' fully briefed objections to

the Preliminary Order of forfeiture, only Scarlato's newly

raised objection relating the investors identified in the

Indictment remains before the court (the "remaining forfeiture

objection").  (See Minute Entry dated 6/7/10.)  For the reasons

set forth below, the court now denies this remaining forfeiture objection.

## A. Forfeiture Standard

Under 18 U.S.C. Section 981(a)(1)(C), the government is entitled to forfeiture of funds that "constitute[] or [are] derived from proceeds traceable to a violation" of the mail and wire fraud statutes or a conspiracy or scheme to commit such offense. See 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(A), and 1961(1)(B); see also United States v. Schlesinger, 396 F. Supp. 2d 267, 274-78 (E.D.N.Y. 2005) aff'd 514 F.3d 277 (2d Cir. 2008), cert. denied 129 S. Ct. 174 (2008) ("any property which 'constitutes or is derived from proceeds traceable to . . .' a violation of mail or wire fraud, or a conspiracy to commit such offense, is subject to criminal forfeiture" ) (quoting 18 U.S.C. § 981(a)(1)(C)) (additional citations omitted).

A court may not enter an order of forfeiture "unless the indictment or information contains notice to the defendant that the Government will seek the forfeiture of the property" as a part of the sentence. Fed. R. Crim. P. 32.2(a). Thus, in any case where the indictment or information contains notice of criminal forfeiture, the court must "determine what property is subject to forfeiture under the applicable statute" following a guilty plea or conviction after trial. Fed. R. Crim. P. 32.2(b)(1)(A). The determination of forfeitability may be based

upon the record from the guilt phase of a trial, or upon any additional reliable and relevant evidence or information submitted by the parties. Fed. R. Crim. P. 32.2(b)(1)(B). If the court finds by a preponderance of the evidence that property is properly subject to criminal forfeiture, the court must promptly enter a preliminary order of forfeiture. Fed. R. Crim. P. 32.2(b)(2)(A); see also United States v. Fuchter, 411 F.3d 377 (2d Cir. 2005) (holding that the preponderance of the evidence standard is the rule for criminal forfeiture findings).

   **B. Application**

      Scarlato's submission elucidates two new bases for limiting the forfeitable amount in the Preliminary Order of Forfeiture. (See Scarlato 6/14/10 Ltr.) First, Scarlato asserts that the forfeiture amount should be limited to the proceeds realized from the victims identified in paragraph 8 of the Indictment as Investors 1, 2, and 3, (see Ind't. ¶ 8); and second, Scarlato contends that the forfeitable funds under Count Seven of the Indictment should be limited to only $50,000 because victim Akwasi Amankwah ("Amankwah") only personally invested that amount while the remaining roughly $50,000 value under that Count came from another source, and because Amankwah was repaid. (See Scarlato 6/14/10 Ltr.)

      The government responds first, that Scarlato's interpretation of the Indictment is unsupported by "any

reasonable construction of [the Indictment's] language, by logic, [or] by case law," and second, that the entire $100,000 attributable to Amankwah is properly included in the forfeiture amount. (See Gov. 6/21/10 Ltr.) The government therefore contends that no limitation on the proposed Preliminary Order of Forfeiture is warranted. (See id.) For the reasons that follow, the court rejects both arguments advanced by Scarlato.

### 1. Scheme to Defraud B.I.M. Investors

Indisputably the government must demonstrate a "requisite nexus between the property and the offense" of conviction prior to forfeiture pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(A). Yet, "[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the 'requisite nexus,' Fed. R. Crim. P. 32.2(b)(1), to that scheme, conspiracy, or enterprise." United States v. Capoccia, 503 F.3d 103, 117-18 (2d Cir. 2007). Thus, although defendants generally cannot be ordered to forfeit funds which are proceeds of uncharged or acquitted conduct, where an indictment charges a conspiracy or scheme to defraud, the proceeds of uncharged or acquitted conduct may become forfeitable because the government may be able to prove that money "involved in the uncharged or acquitted [conduct] nevertheless constituted the proceeds of, or was

traceable to, or was involved in, the [conspiracy or scheme to defraud] crime of conviction." See id. at 117.

While Scarlato correctly identified these controlling rules and precedent, Scarlato errs in his contention that "the indictment [in this case] charged Mr. Scarlato with participating in a scheme to defraud [only] the named investors" identified in paragraph 8 of the Indictment. (See Scarlato 6/14/10 Ltr. at 4.) The plain language of the Indictment reveals otherwise. The "Introduction" section of the Indictment sets forth in paragraphs 1-8 certain defined terms under a preamble which notes that the terms are defined "unless otherwise indicated." (See Ind't. ¶¶ 1-8.) For example, paragraph 1 of the Indictment defines a Nevada corporation known as "B.I.M." while paragraph 2 of the Indictment defines a New Jersey corporation known as "Metro." (See id. at ¶¶ 1, 2.) Similarly, paragraph 8 of the Indictment defines "Investor No. 1, Investor No. 2, and Investor No. 3" as "B.I.M. investors whose identities are known to the Grand Jury." [18] (id. at ¶ 8.)

Scarlato argues that because the definition in paragraph 8 does not elaborate and explain that Investors Nos. 1, 2, and 3 were "among" the B.I.M. investors alleged to have been defrauded, this indicates that the individuals identified

---

[18] As noted *supra* Note 2, the evidence at trial showed that Investors Nos. 1, 2, and 3 were Peter Valentini, Marcello Valenzano, and Vernon Wetmore, respectively. (See Tr. 1601.)

in paragraph 8 are the exclusive B.I.M. investors victimized by defendants' scheme to defraud which is charged in Count One of the Indictment. This argument ignores the plain meaning of the definition contained in paragraph 8, which can only be understood as defining Investors Nos. 1, 2, and 3 as specific individuals "whose identities are known to the Grand Jury" without limiting the undefined term "investors," which is used elsewhere in the Indictment, to those three individuals. Indeed, nowhere in paragraph 8, nor elsewhere in the Indictment, is the generic term "investors" defined or limited to only Investors Nos. 1, 2, and 3.[19] Moreover, where the Indictment intends to refer to a specific investor, as in paragraph 17, it does so. Meanwhile, the conspiracy charged in Count One and set forth in paragraphs 10-15 of the Indictment refers to generic B.I.M. "investors and lenders" which accordingly may include, but is not limited to, the previously defined individual Investors Nos. 1, 2, and 3. Thus, reviewing the plain language of the Indictment in the context of the document as a whole, it is clear that the Indictment charged the defendants with

_____

[19] For example, after defining Investor Nos. 1, 2, and 3, paragraph 8 could have, but did not, include a phrase defining those three investors collectively, such as "(together, 'investors')." Alternatively, contrary to Scarlato's suggestion, paragraph 8 simply does not state that Investors Nos. 1, 2, and 3 "were *the* B.I.M. investors," rather, the text of paragraph 8 reads that Investors Nos. 1, 2, and 3 "were B.I.M. investors whose identities are known to the Grand Jury." (Ind't at ¶ 8.) Finally, there is no stand-alone paragraph in the Introduction or elsewhere in the Indictment which defines the terms "investors." (See generally Ind't.)

conspiracy to defraud not only the individuals identified as Investors Nos. 1, 2, and 3, but rather "B.I.M. investors and lenders" generally.

Moreover, here, unlike in Capoccia, upon which Scarlato relies, because the offenses of conviction include a conspiracy charge, the "breadth of the conduct forming the basis of the offense of conviction" includes a broader category of criminal conduct encompassed by the overall scheme to defraud. See Capoccia, 503 F.3d at 117-18 (noting that unlike in cases involving conspiracy charges, where a defendant's conviction "is *not* for a scheme, conspiracy, or enterprise," but rather relates to "individual instances of transferring stolen money," any uncharged transfers could not have the "requisite nexus" to the conduct underlying the conviction and therefore were not properly forfeitable) (emphasis added). Accordingly, here, in addition to the funds obtained from the three investors individually specified in the Indictment, the funds obtained from the additional investors who testified at trial possess the "requisite nexus" to the overall scheme "to defraud B.I.M. investors and lenders" charged in Count One of the Indictment, and of which all defendants were convicted.

A common-sense reading of the plain language of the Indictment, the applicable rules, and relevant case law thus demonstrate that the properly forfeitable property in this case

need not be limited to those funds obtained from the three investors specifically identified in the Indictment as Investors Nos. 1, 2, and 3, but rather should encompass all funds obtained as part of the overall scheme to defraud, of which all defendants were convicted.

### 2. Forfeitable Amount Attributable to Amankwah

Scarlato also argues that the amount of forfeitable funds relating to Count Seven of the Indictment should be limited to victim Amankwah's personal investment of $50,000, presumably because the remaining amount came from another source, and further, that even the $50,000 amount should not be included in the forfeitable amount because Amankwah was compensated. (Scarlato 6/14/10 Ltr. at 2.) First, it is unclear why Scarlato believes that the forfeitable amount in connection with Count Seven should be limited to Amankwah's own $50,000 investment. Count Seven again charges the defendants with devising a scheme or artifice to defraud "B.I.M. investors and lenders," nowhere limited to Amankwah. Moreover, as the court discussed on the record during the forfeiture hearing, the proceeds from defendants' fraudulent scheme in this case are properly defined by 18 U.S.C. Section 981(a)(2)(A), which unambiguously states that "proceeds" for cases "involving illegal goods, illegal services, [and other] unlawful activities" as here, means "property of any kind, obtained

directly or indirectly, as the result of the commission of the offense giving rise to the forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."[20]

Accordingly, the funds obtained from both Amankwah and Caring Little Hands represent proceeds of the fraud charged in Counts One and Seven of the Indictment and such funds are forfeitable as proceeds of defendants' unlawful conduct.

The plain language of the Indictment, the relevant case law, rules, and statutory authority therefore cannot support defendants' remaining forfeiture objection, and that objection is therefore denied.

## CONCLUSION

As set forth above, the defendants' motions for judgment of acquittal under Rule 29 are denied, Reisman's motion for a new trial under Rule 33 is denied, and defendants' remaining forfeiture objection is denied. By September 30, 2010, the government shall submit for the court's endorsement a

---

[20]    As noted by Scarlato, the 9th Circuit held in 2004 that 18 U.S.C. Section 981(a)(2)(C), the provision cited by Scarlato for "cases involving fraud in the process of obtaining a loan or an extension of credit" applies only to civil forfeiture. See United States v. Boulware, 384 F.3d 794, 813 (9th Cir. 2004), rev'd on other grounds, 552 U.S. 421 (2008). Although Scarlato notes his disagreement with the Ninth Circuit's holding, he does not cite any Second Circuit authority to the contrary. Moreover, Scarlato does not cite any Second Circuit case which does apply 18 U.S.C. Section 981(a)(2)(C) in the criminal forfeiture context, much less allows that provision to limit the amount of forfeitable proceeds flowing from a conviction under the mail and wire fraud statutes.

revised Preliminary Order of Forfeiture for the amount of $1,104,000 which represents the proceeds obtained from the crimes charged in the Indictment and of which defendants were convicted at trial. 18 U.S.C. § 981(a)(1)(C), Fed. R. Crim. P. 32.2(b)(2)(A).

SO ORDERED.

Dated:     Brooklyn, New York
           September 27, 2010

                              _____/s/_____
                              **KIYO A. MATSUMOTO**
                              United States District Judge